## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No.: _____**

STANLEY LIEBLEIN, Derivatively on Behalf of THE WESTERN UNION COMPANY,

        Plaintiff,

    v.

HIKMET ERSEK,
SCOTT T. SCHEIRMAN,
JACK M. GREENBERG,
DINYAR S. DEVITRE,
RICHARD A. GOODMAN,
BETSY D. HOLDEN,
LINDA FAYNE LEVINSON,
ROBERTO G. MENDOZA,
MICHAEL A. MILES, Jr.,
WULF von SCHIMMELMANN, and
SOLOMON D. TRUJILLO,

        Defendants,

and

THE WESTERN UNION COMPANY, a Delaware Corporation,

        Nominal Defendant.

---

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
## FOR VIOLATIONS OF SECURITIES EXCHANGE ACT, BREACHES OF FIDUCIARY
## DUTIES, UNJUST ENRICHMENT, CORPORATE WASTE, AND INSIDER TRADING

---

By and through his undersigned counsel, Plaintiff Stanley Lieblein ("Plaintiff") hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") on behalf of The Western Union Company ("Western Union" or the "Company") and against certain current and former officers and directors of the Company for violations of the Securities Exchange Act of 1934 (the "Exchange Act"), breaches of fiduciary duties, unjust enrichment, corporate waste, insider trading, and aiding and abetting thereof.

## NATURE AND SUMMARY OF THE ACTION

1.      Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon information and belief derived from the investigation of counsel, which included, without limitation: a) review and analysis of public filings made by Western Union and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; c) review of news articles, shareholder communications, and postings on Western Union's website concerning the Company's public statements; d) pleadings, papers, and any documents filed with and publicly available from the related pending securities class action, *City of Taylor Police and Fire Retirement System v. The Western Union Company et al.*, No. 1:13-cv-03325-MSK-MJW (D. Colo.) (the "Securities Class Action"); and e) review of other publicly available information concerning Western Union and the Individual Defendants (defined herein).

2.      Western Union operates three principal business segments: (a) Consumer-to-consumer ("C2C"), (b) Consumer-to-business, and (c) Business solutions. Western Union's C2C segment offers money transfer services between consumers, through a global network of third-party agents, using the Company's multi-currency,

real-time money transfer processing systems.  Western Union provides its C2C services for both international cross-border transfers and intra-country transfers.  Western Union derives its revenue from its C2C segment by charging consumers transaction fees to transfer money, and, in money transfers involving different send and receive currencies, by generating revenue from the difference between the exchange rate Western Union sets for its consumers and the actual exchange rate at which Western Union is able to secure the currency.  Western Union's C2C business segment is by far the Company's largest business segment, bringing in over 80% of the Company's revenues.

3.      This action arises out of the efforts of the Individual Defendants from approximately April 27, 2010 through October 30, 2012 (the "Relevant Period") to artificially inflate the price of Western Union's common stock by issuing, or authorizing the issuance of, materially false and misleading statements regarding the Company's trends, revenues, and revenue growth for Western Union's C2C business involving Mexico and Latin America.   During the Relevant Period, the Individual Defendants caused the Company to announce positive trends and revenues from its C2C segments involving Mexico and Latin America that improved significantly, both quarter-over-quarter and year-over-year.   But the Individual Defendants failed to disclose that the revenues and positive trends for these markets were unsustainable, and instead were about to turn dramatically negative.

4.      In particular, on February 11, 2010, Western Union entered into a settlement agreement with the state of Arizona (hereinafter referred to as the "Arizona Settlement Agreement" or the "Southwest Border Agreement").  The Arizona Settlement Agreement came after a lengthy investigation of Western Union, which concerned

Western Union's inability or unwillingness to take meaningful steps to prevent its C2C services from being used to facilitate money laundering or other criminal activity (including human trafficking and drug trafficking) between Arizona and Mexico (and other Latin American countries).

5.     In its Form 8-K filed with the SEC in February 2010 announcing the Arizona Settlement Agreement, the Company stated that the Arizona Settlement Agreement "resolve[d] all outstanding legal issues and claims with the State, and provides that Western Union will reimburse the State up to $21 million for certain of its costs associated with this matter and pay up to $50 million to fund a multi-state not-for-profit organization promoting safety and security along the U.S. and Mexico border. Western Union accrued for this contingency in the third quarter of 2009."  Further, the February 2010 8-K stated, "as part of the Settlement Agreement, Western Union expects to make certain investments in its compliance programs along the U.S. and Mexico border and to engage a monitor of that program, which are expected to cost up to $23 million over the next several years. These amounts will be expensed as incurred and were included in Western Union's 2010 outlook provided in its fourth quarter 2009 earnings announcement released on February 3, 2010."  Similarly, the Company's Form 10-K Annual Report for the fiscal year ended December 31, 2009, also filed with the SEC in February 2010, stated that the costs of the monitor and the Company's investment in compliance programs along the U.S. and Mexico border were expected to reach "up to $23 million" over "the next two to four years," or "over the period from signing to 2013."

6.      Thereafter, beginning with reporting the Company's Q1 2010 earnings in April 2010, and continuing through at least early 2012, the Individual Defendants caused the Company to report steadily positive trends and improving revenues from its C2C business involving Mexico and Latin America, tout how these trends and revenue growth were expected to continue, and even highlight the Company's anti-money laundering ("AML") and regulatory expertise as among the Company's "strengths" and "competitive advantages."

7.      While the Individual Defendants caused the Company to emphasize and highlight the positive growth trends in Western Union's C2C business involving Mexico and Latin America, at no time during this period did the Individual Defendants cause the Company to disclose that, given the Company's burdens and obligations, or likely burdens and obligations, under the Arizona Settlement Agreement, these positive trends were unlikely to continue.  Nor did the Individual Defendants cause the Company to disclose that these trends were significantly at risk, especially given the burdens and obligations the Company expressly assumed under the Arizona Settlement Agreement, as well as the wide discretion given to the monitor appointed under that agreement to mandate substantial and material changes to Western Union's business practices. Instead, the Individual Defendants merely caused the Company to report over and over that the Company's expected costs to comply with the Arizona Settlement Agreement would only amount "up to $23 million."

8.      Beginning in approximately February 2012, however, the truth began to slowly surface.  First, in late February 2012 – two full years after the Company executed the Arizona Settlement Agreement and the monitor was appointed under that

agreement – the Individual Defendants caused the Company to report for the first time that the Company was "in the process of making certain changes to [its] compliance program for transactions from the United States to Mexico," and that "[s]uch changes will likely have an adverse effect on our United States to Mexico business."  But the Individual Defendants failed to cause the Company to meaningfully describe what adverse effects the changes being implemented would likely have (for example, such as the anticipated loss of thousands of agents in Mexico who could not satisfy new compliance protocols).  Nor did the Individual Defendants disclose that this adverse impact could extend to the Company's C2C business involving Latin America, or could extend to other business segments such as the Company's business solutions segment.  And the Individual Defendants failed to cause the Company to disclose that its ability to meet its compliance obligations under the Arizona Settlement Agreement in a timely manner was also at risk, which could cause further, serious repercussions. Instead, the Individual Defendants caused the Company to affirm its 2012 outlook, and to continue to reassure investors that the Company's compliance costs associated with the Arizona Settlement Agreement were only expected to reach up to $23 million.

9.     In July 2012, however, in announcing the Company's Q2 2012 earnings, the Individual Defendants for the first time caused the Company to disclose that its compliance costs under the Arizona Settlement Agreement would likely exceed $23 million.   Nonetheless, the Individual Defendants caused the Company to **raise** its earnings-per-share (EPS) outlook for 2012.

10.     Only three months later, in announcing and reporting its Q3 2012 earnings in late October 2012, the Individual Defendants dropped a bombshell, causing the

Company to reveal that its Q3 2013 revenues from its C2C business involving North America and Latin America had plummeted because of the Company's compliance changes.  Further, the Individual Defendants caused the Company to disclose that it had ended its relationship with over 7,000 Vigo agent locations in Mexico who were unable to meet the Company's new compliance requirements.   The Individual Defendants also caused the Company to disclose for the first time that its compliance related actions negatively impacted its C2C business beyond Mexico, impacting its C2C business involving Latin America.  And, only three months after causing the Company to raise its 2012 EPS outlook, the Individual Defendants caused the Company to significantly lower its 2012 EPS outlook.  Western Union's stock plummeted 29%, or $5.20 per share, on heavy trading volume, to close at a Relevant Period low (and then-three-year low) of $12.73 per share on October 31, 2012.

11.   After the Relevant Period, the Company also disclosed in February 2013 that its actual amount spent as of that time on its compliance efforts under the Arizona Settlement Agreement was $40 million – far exceeding the $23 million expectation that the Individual Defendants caused the Company to represent throughout most of the Relevant Period.  And, also for the first time in February 2013, the Company disclosed that it did not expect to be able to fully satisfy its burdens and obligations under the Arizona Settlement Agreement by the time required under that agreement, and that, if the Company could not reach an agreement with the state of Arizona to extend the compliance periods (or if the Court did not approve an extension), Western Union faced serious repercussions, including potential civil and criminal actions against the Company.  Indeed, since first disclosing this risk in 2013, the Company has sought and

secured three extensions, the latest extension granted by an Arizona court on December 20, 2013.

12.     Also during the Relevant Period, Hikmet Ersek (the Company's CEO for most of the Relevant Period) ("Ersek") and Scott T. Scheirman (the Company's CFO for the entire Relevant Period) ("Scheirman") violated section 10(b) of the Exchange Act. Specifically, Ersek and Scheirman made false or materially misleading statements concerning: (a) the nature and sustainability of the positive trends, revenue, and revenue growth for the Company's C2C business involving Mexico and Latin America; (b) the purported comprehensiveness and effectiveness of the Company's internal controls and global AML/regulatory capabilities; (c) the true nature, scope, and extent of the Company's actual or likely burdens and obligations under the Arizona Settlement Agreement; and (d) the true nature, scope, and extent of the risks or likely risks to the Company's C2C business involving Mexico and Latin America stemming from the Company's burdens and obligations under the Arizona Settlement Agreement.  At the same time, Ersek and/or Scheirman directed and orchestrated the repurchase of $1.557 billion of the Company's stock at prices they knew were inflated.   The Director Defendants (as defined herein), who exercised actual power and control over Ersek's and Scheirman's actions, are jointly and severally liable under section 20(a) of the Exchange Act for the false and misleading statements and the Company's repurchase of stock at inflated prices.

13.     Furthermore, during the Relevant Period – while the Individual Defendants orchestrated or allowed the Company to report the materially false and misleading statements described herein – Scheirman offloaded millions of dollars of his personal

holdings of Western Union common stock, during two periods of highly unusual and suspicious sales.

14.     As a result of the Individual Defendants' wrongdoing, the Company has sustained damages, including, but not limited to: (a) costs and expenses incurred in having to defend the Securities Class Action brought against the Company and certain officers plus potentially millions or billions of dollars in settlement or to satisfy an adverse judgment; (b) costs incurred from compensation and benefits paid to the Individual Defendants, which compensation, at least with respect to Ersek and Scheirman (as officers of the Company), was based at least in part on Western Union's artificially-inflated stock price; (c) costs incurred from the Company buying back $1.557 billion worth of shares of Company stock at prices inflated through the Individual Defendants' misconduct; (d) increased borrowing costs and expenses associated with the Company's credit rating being downgraded by at least one rating agency as a result of the Individual Defendants' misconduct; and (e) damages incurred from customers' loss of confidence in Western Union and its products and services.

15.     Western Union's Board of Directors ("Board") has not, and will not, commence litigation against Defendants, let alone vigorously prosecute such claims, because they face a substantial likelihood of liability to Western Union for making, authorizing, or failing to correct the false and misleading statements alleged herein. Accordingly, a pre-suit demand upon the Western Union Board is a useless and futile act.  Plaintiff rightfully brings this action to vindicate Western Union's rights against its wayward fiduciaries and hold them responsible for the damages they have caused Western Union.  More specifically, Plaintiff brings this derivative action to: (i) recover

damages against Western Union's officers and directors for the benefit of the Company; and (ii) require the Company to reform and improve its corporate governance and internal procedures to protect Western Union and its shareholders from a repeat of the damaging events described below.

## JURISDICTION AND VENUE

16.    The Court has jurisdiction in this case under Article III of the United States Constitution and 28 U.S.C. § 1331 because the first and second causes of action arise under the Exchange Act.

17.    The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over all other claims that are so related to claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

18.    The Court has jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in Colorado, or is an individual who has sufficient minimum contacts with Colorado so as to render the exercise of jurisdiction by the Colorado courts permissible under traditional notions of fair play and substantial justice.  This action is not a collusive one to confer jurisdiction on this Court which it would not otherwise have.

19.    Venue is proper in this District pursuant to 28 U.S.C § 1391 because one or more of the Defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein – including the Individual Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting in violations of fiduciary duties owed to Western Union – occurred in this District, and Defendants have received substantial compensation in this District by

doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

20.    Plaintiff is a shareholder of Western Union common stock.  Plaintiff purchased shares of Western Union common stock on March 3, 2010, continuously held his shares throughout the Relevant Period, and continues to hold his shares of Western Union stock.  Plaintiff is a resident of New York, New York.

21.    Nominal Defendant Western Union is a Delaware corporation with principal executive offices located at 12500 East Belford Avenue, Englewood, Colorado 80112.  Western Union describes itself as "a leader in global money movement and payment services, providing people and businesses with fast, reliable and convenient ways to send money and make payments around the world. The Western Union® brand is globally recognized. The Company's services are primarily available through a network of agent locations in more than 200 countries and territories. Each location in the Company's agent network is capable of providing one or more of the Company's services."

22.    Defendant Ersek is currently Western Union's President, CEO, and a director, and has been President, CEO, and a director since September 2010.  Before becoming President, CEO, and a director in September 2010, Ersek was the Company's Chief Operating Officer.  By the Company's admission, Ersek is an "inside" director.  Ersek received approximately $7.87 million in total compensation in 2011, and $6.99 million in 2012.

23.    Defendant Scheirman was Executive Vice President and Chief Financial Officer for Western Union at all times during the Relevant Period, and until December

31, 2013.  Scheirman received approximately $3.13 million in total compensation in 2011, and $2.46 million in 2012.

24.    Defendant Jack M. Greenberg ("Greenberg") is currently the Chairman of the Board ("COB") of Western Union, and served as COB throughout the Relevant Period.  Greenberg also serves as Chair of the Board's Compliance Committee, and has served as Chair of the Compliance Committee since its inception on or about May 30, 2013.

25.    Defendant Dinyar S. Devitre ("Devitre") is a director and has served as a director on the Company's Board since 2006.  Devitre currently serves on the Board's Audit Committee and the Board's Corporate Governance and Public Policy Committee (as Chair).  Devitre served on the Audit Committee throughout the Relevant Period and was Chair of the Audit Committee during a substantial and material part of the Relevant Period (including from the beginning of the Relevant Period through May 22, 2012).  Devitre also served on, and was Chair of, the Corporate Governance and Public Policy Committee for a substantial and material part of the Relevant Period (from May 23, 2012 onward).

26.    Defendant Richard A. Goodman ("Goodman") is a director and has served as a director on the Company's Board since January 1, 2012.  Goodman currently serves on the Board's Audit Committee.  Goodman served on the Audit Committee throughout the Relevant Period, currently is Chair of the Audit Committee, and was Chair of the Audit Committee during a substantial and material part of the Relevant Period (from May 23, 2012 onward).

27.    Defendant Betsy D. Holden ("Holden") is a director and has served as a director on the Company's Board since 2006.  Holden currently serves on the Board's Corporate Governance and Public Policy Committee and the Board's Compensation and Benefits Committee.  Holden served on the Corporate Governance and Public Policy Committee throughout the Relevant Period, and was Chair of the Corporate Governance and Public Policy Committee during a substantial and material part of the Relevant Period (including from the beginning of the Relevant Period through May 22, 2012).

28.    Defendant Linda Fayne Levinson ("Levinson") is a director and has served as a director on the Company's Board since 2006.  Levinson currently serves on the Board's Audit Committee and the Board's Corporate Governance and Public Policy Committee.  Levinson served on the Audit Committee throughout the Relevant Period.

29.    Defendant Roberto G. Mendoza ("Mendoza") is a director and has served as a director on the Company's Board since 2006.  Mendoza currently serves on the Board's Audit Committee and the Board's Compensation and Benefits Committee.  Mendoza served on the Audit Committee throughout the Relevant Period.

30.    Defendant Michael A. Miles, Jr. ("Miles") is a director and has served as a director on the Company's Board since 2006.  Miles currently serves on the Board's Audit Committee and the Board's Compliance Committee (and has served on the Compliance Committee since its inception on or about May 30, 2013).  Miles served on the Audit Committee throughout the Relevant Period.

31.    Defendant Wulf von Schimmelmann ("Schimmelmann") is a director and has served as a director on the Company's Board since 2009.   Schimmelmann currently serves on the Board's Corporate Governance and Public Policy Committee, and served on the Corporate Governance and Public Policy Committee throughout the Relevant Period.

32.    Defendant Solomon D. Trujillo ("Trujillo") is a director and has served as a director on the Company's Board since July 2012.   Trujillo currently serves on the Board's Compensation and Benefits Committee.

33.    Defendants  Ersek, Scheirman, Greenberg, Devitre, Goodman, Holden, Levinson, Mendoza, Miles, Schimmelmann, and Trujillo are sometimes collectively referred to herein as the "Individual Defendants."

34.    Defendants Ersek, Greenberg, Devitre, Goodman, Holden, Levinson, Mendoza, Miles, Schimmelmann, and Trujillo are sometimes collectively referred to herein as the "Director Defendants."

35.    Defendants Devitre, Goodman, Levinson, Mendoza, and Miles are sometimes collectively referred to herein as the "Audit Committee Defendants."

36.    Defendants Devitre, Holden, Miles, and Schimmelmann are sometimes collectively referred to herein as the "Corporate Governance and Public Policy Committee Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.    Background Facts

37.    Through its global network of more than 500,000 outside agents in 200 countries, Western Union is the largest money transfer company in the world, holding a nearly 18% market share in the international remittance market.  As noted, Western

Union's C2C business segment is by far the Company's largest and most profitable segment, consistently generating over 80% of the Company's revenues over each of the last three fiscal years.  The C2C segment operates via three distinct brands: the Western Union brand, the Vigo brand, and the Orlandi Valuta brand.  The Vigo and Orlandi Valuta brands operate extensively in Mexico and Latin America.

38.     Western Union's C2C segment primarily targets consumers who are unbanked or underserved by financial institutions, largely consisting of migrants who need to send money back to their home countries.  These funds, called remittances, are mostly spent on housing, food, clothing, and durable consumer goods.  Remittances sent from immigrants in wealthier countries are a staple source of income for many developing countries, including Mexico, where such remittances represent the second largest foreign source of income after oil exports.

39.     The United States is the largest send-side location in the world for Western Union, with U.S. outbound payments generating 20% of Western Union's total revenue.  Further, the largest number of U.S. outbound remittances go to Mexico and the Philippines.

40.     Many of Western Union's customers do not have access (or full access) to traditional banking institutions because they lack the money or proper documentation to open a traditional account.  Further, recipients of funds sent by Western Union are often located in rural villages in less developed countries.  Accordingly, immigrants are likely to turn to remittance companies like Western Union as the only secure option for sending money.  Money transfer companies like Western Union can therefore charge more for their services over traditional banks.  Wire transfer customers are routinely

charged a fee of more than 10% of the total value of the transaction, and in some cases as much as 20%.

41.    Western Union is the dominant force and has long enjoyed the highest profit margins in the remittance industry, in some instances commanding a 50% premium over competitors.   Much of Western Union's success has stemmed from its ability to require agents to operate under exclusivity agreements, including agents operating under the Vigo and Orlandi Valuta brands.   Western Union has also often maintained a higher dollar threshold at which point consumers would be required to show identification to conduct a transaction over Western Union's competitors, giving the sender more anonymity.   Some customers were willing to pay higher fees for more anonymity and a significantly larger network of locations to send and receive funds.

42.    Because Western Union's business often involves sending money across international borders, compliance with AML and other regulations is a significant concern for the Company. Within the United States, Western Union is regulated by various state and federal laws.   Store agents are required to maintain accurate records and file reports of suspicious activity, such as documenting efforts to split a single payment into smaller transactions or identifying large withdrawals.

43.    Stringent AML controls at traditional banking institutions have largely shut drug dealers and human traffickers out of the formal financial system.   Wire transfer companies, in contrast, have been particularly susceptible in the human trafficking arena, because many of the transactions involve small dollar amounts, can be instituted from various locations, and can be completed very quickly.   The transactions can also be completed virtually anonymously in certain locations, even if identification is

required, as many individual clerks have been corrupted to accept insufficient or false identification.

44.    Western Union, as the most dominant player in the international remittance industry with the highest profit margins, has long been the target of investigations by various state and federal agencies. One such investigation is an investigation initiated by the state of Arizona against Western Union in 2001, alleging that the Company was not meeting its legal obligations to report suspicious activity.

45.    Notably, through written testimony submitted to the Senate Judiciary Committee, subcommittee on Crimes and Drugs and the Senate Caucus on International Narcotics Control, dated March 17, 2009, Terry Goddard, the former Attorney General for the state of Arizona, testified concerning the critical role that wire transfer companies played in facilitating illegal human trafficking, and also testified about the state of Arizona's findings concerning Western Union's role in particular:

> Organized, cross-border crime between Mexico and Arizona is concentrated on trafficking in illegal drugs, humans and weapons. Each of these activities involves the movement of money. Human trafficking in particular requires rapid movement of money among people who have no ongoing relationship. Western Union is by far the largest provider of illicit money-movement services, so it is the source of valuable information about illicit money movements and has been the focus of interdiction efforts aimed at criminal proceeds in transit.

> Human smuggling organizations, also known as "coyotes," are well-organized and violent. Their human "cargo" are often victimized, held for ransom or worse. In one typical case, 20 undocumented immigrants were taken by six smugglers to a Phoenix drop house. Soon after arriving, the immigrants were informed that the price for bringing them into Arizona would be twice as high as they had been told. When one member of the group objected, the coyotes walked him into another room, shot and killed him.

Human smuggling is not just violent, it is highly profitable. Hundreds of millions of dollars have been wire transferred into Arizona to pay for smuggling human beings. To cut down on coyote activities, the Arizona Attorney General's Office has for several years used "sweeping" warrants to screen the wire transfers of cash that pay coyotes for smuggling people into Arizona and intercept the most suspicious.

Intercepting wire transfers of criminal proceeds has proven an effective tool. Between 2003 and 2007, my Office seized more than $17 million in wire payments and arrested more than 100 smugglers. Every effort has been made to focus the warrants on activity known to be consistent with human smuggling based on a variety of identifying factors. Any legitimate cash transfers detained in the process were promptly returned, usually within 24 hours. On investigation, less than 10 percent of intercepted transfers over those years turned out to be legitimate.

Our success in seizing smuggling payments sent to Arizona dramatically reduced the volume of wire transfers into Arizona by hundreds of millions of dollars. The coyote organization that committed the Phoenix drop house murder in the example above, like many other such organizations, began to route its wire transfer payments to Sonora in northern Mexico. In response to this change in coyote tactics, we targeted 26 wire transfer locations on the Mexican side of the border. Western Union, the nation's dominant wire transfer company, went to court to stop our efforts. The Arizona Court of Appeals upheld our methods. The matter is still in litigation.

Our seizure warrants are similar to court-ordered wiretaps. Our warrants do temporarily detain some legitimate transfers, in the same way wiretaps sometimes record non-criminal conversations. Courts have authorized both seizure warrants and wiretaps when presented with evidence of reasonable probability of criminal activity and when every effort is made to minimize the impact on innocent people. That is exactly what my Office has done in this program.

With Arizona the Nation's leading gateway for human trafficking, I will continue to use all legal means available to deter and prosecute human smugglers. Seizure warrants have proven to be the most effective weapon in the fight. However, even though wire transfers are the coyotes' payment method of choice, Western Union still refuses to comply with subpoenas for vital data. I plan to use every legal means to force the compliance of money transmitters and stop Western Union and other money transmitters from doing business with these brutal criminals.

**B.     The Arizona Settlement Agreement**

46.     On or about February 12, 2010, one or more of the Individual Defendants

caused the Company to file a Form 8-K with the SEC, announcing that the Company

had entered into the Arizona Settlement Agreement:

> On February 11, 2010, Western Union Financial Services, Inc.
> ("Western Union"), a subsidiary of The Western Union Company,
> entered into a Settlement Agreement with the State of Arizona (the
> "State") regarding claims concerning Western Union's ability to
> prevent its service from being abused to launder money or to
> facilitate other criminal activity. The Settlement Agreement resolves
> all outstanding legal issues and claims with the State, and provides
> that Western Union will reimburse the State up to $21 million for
> certain of its costs associated with this matter and pay up to $50
> million to fund a multi-state not-for-profit organization promoting
> safety and security along the U.S. and Mexico border. Western
> Union accrued for this contingency in the third quarter of 2009. In
> addition, as part of the Settlement Agreement, Western Union
> expects to make certain investments in its compliance programs
> along the U.S. and Mexico border and to engage a monitor of that
> program, which are expected to cost up to $23 million over the next
> several years. These amounts will be expensed as incurred and
> were included in Western Union's 2010 outlook provided in its
> fourth quarter 2009 earnings announcement released on
> February 3, 2010.

47.     Thereafter, on or about February 26, 2010, one or more of the Individual

Defendants caused the Company to file with the SEC the Company's Form 10-K

Annual Report for the fiscal year ended December 31, 2009.  The February 26, 2010

Form 10-K stated the following regarding the Arizona Settlement Agreement:

> During the year ended December 31, 2009, we recorded an accrual
> of $71.0 million for an anticipated agreement and settlement with
> the State of Arizona. On February 11, 2010, we signed this
> agreement and settlement, which resolved all outstanding legal
> issues and claims with the State and requires us to fund a multi-
> state not-for-profit organization promoting safety and security along
> the United States and Mexico border, in which California, Texas
> and New Mexico will participate with Arizona. The accrual includes

amounts for reimbursement to the State of Arizona for its costs associated with this matter. In addition, as part of the agreement and settlement, we expect to make certain investments in our compliance programs along the United States and Mexico border and to engage a monitor of that program, which are expected to cost up to $23 million over the next two to four years.

### C.    False and Misleading Statements

48.    After the Company entered into the Arizona Settlement Agreement, beginning with the Company's announcement of its Q1 2010 earnings in April 2010, and continuing over the next two and one half years, the Individual Defendants caused the Company to engage in a pattern of reporting and conduct that: (a) portrayed a rosy picture of the Company's trends, revenues, and revenue growth for its C2C business involving Mexico and Latin America, (b) downplayed and understated the costs and expenses that the Company was likely to face in complying with its obligations under the Arizona Settlement Agreement, and (c) concealed the true nature and scope of the risks that the Arizona Settlement Agreement posed to the Company's revenues and revenue growth from its C2C business involving Mexico and Latin America.

49.    Specifically, on or about April 27, 2010, one or more of the Individual Defendants caused the Company to publish a press release announcing the Company's earnings for Q1 2010, which also highlighted encouraging revenue trends for Mexico:

> The Americas region reported a revenue decline of 3% and a transaction increase of 8%. The rate of decline in revenue was the lowest since the third quarter of 2008. The region's transaction improvement was driven by strong growth in U.S. domestic money transfer following the fourth quarter 2009 repositioning of the business. Domestic transactions increased 18%, while revenue declined 13%. The repositioning has contributed to significant increases in transactions, and domestic revenue growth is expected to follow later in the year. Mexico recorded declines of 7%

in revenue and 3% in transactions, which were significant improvements relative to 2009 trends.

50.     Similarly, during an investor/analyst conference call and web hosting held by the Company on or about April 27, 2010, and through a PowerPoint presentation that was presented and/or discussed during that conference call, one or more of the Individual Defendants caused the Company to highlight the fact that "Mexico trends improved compared to Q4 2009."

51.     Thereafter, on or about May 6, 2010, one or more of the Individual Defendants caused the Company to file with the SEC the Company's Form 10-Q Quarterly Report for Q1 2010.  The Form 10-Q included the following certification by Scheirman:

> I, Scott T. Scheirman, certify that:
>
> 1. I have reviewed this Quarterly Report on Form 10-Q of The Western Union Company;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the periods in which this report is being prepared;

(b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the periods covered by this report based on such evaluation; and

(d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

52.     Regarding Western Union's C2C business in the Americas region for Q1 2010, one or more of the Individual Defendants caused the Company to report in the May 6, 2010 Form 10-Q (in relevant part):

> The Americas region (including North America, Latin America, the Caribbean and South America) of our consumer-to-consumer segment represented 31% of our total consolidated revenue for the three months ended March 31, 2010. The region experienced revenue declines despite transaction growth primarily due to the pricing reductions taken in the fourth quarter of 2009.
>
> ....
>
> Americas revenue declined despite transaction growth for the three months ended March 31, 2010 compared to the same period in 2009, primarily due to the pricing reductions taken in the fourth quarter of 2009. Our domestic business experienced revenue declines of 13% on transaction growth of 18% for the three months ended March 31, 2010 due to these factors. However, the revenue declines moderated from the declines experienced in the three months ended December 31, 2009. Our Mexico business also contributed to the revenue decline in the Americas region with revenue declines of 7% and transaction declines of 3% for the three months ended March 31, 2010. Our United States outbound business experienced both transaction and revenue growth in the three months ended March 31, 2010.

53.     Further, regarding "Litigation and Related Contingencies," and more specifically regarding the Arizona Settlement Agreement, one or more of the Individual Defendants caused the Company to report in the May 6, 2010 Form 10-Q (in relevant part):

> During the third quarter of 2009, the Company recorded an accrual of $71.0 million for an anticipated agreement and settlement with the State of Arizona. On February 11, 2010, the Company signed this agreement and settlement, which resolved all outstanding legal issues and claims with the State and requires the Company to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico will participate with Arizona. The accrual includes amounts for reimbursement to the State of Arizona for its costs associated with this matter. In addition, as part of the

agreement and settlement, the Company expects to make certain investments in its compliance programs along the United States and Mexico border and to engage a monitor for that program, which are expected to cost up to $23 million over the next two to four years. During the first quarter of 2010, cash payments of $17.0 million were made related to the agreement and settlement.

54.     In sum, through the April 27, 2010 press release and presentation regarding the Company's Q1 2010 earnings, and through the May 6, 2010 Form 10-Q, one or more of the Individual Defendants caused the Company to portray a positive picture regarding the improving trends in the Company's C2C business involving the Americas (and Mexico in particular), and to continue to represent that the Arizona Settlement Agreement "resolved all outstanding legal issues and claims" with the state of Arizona and would only cost the Company up to $23 million over the next four years. The Individual Defendants gave no indication that the positive C2C Americas/Mexico trends were at all at risk due to the Company's actual or likely burdens and obligations under the Arizona Settlement Agreement.

55.     Thereafter, on or about July 27, 2010, one or more of the Individual Defendants caused the Company to publish a press release announcing the Company's earnings for Q2 2010.  Through the July 27, 2010 press release, one or more of the Individual Defendants caused the Company to continue to highlight and emphasize positive revenue trends and momentum for the Company's C2C Americas and Mexico business:

The Americas region increased revenue 1% on transaction growth of 12%. The region's transaction improvement was driven by strong growth in U.S. domestic money transfer, positive trends in Mexico, and continued strength in U.S.-originated transactions to the rest of the world. Domestic transactions increased 28%, while revenue declined 10%. The repositioning of the U.S. domestic business has contributed to significant increases in transactions, and the

Company expects domestic revenue growth to follow later in the year. In Mexico, revenue increased 4% and transactions grew 5%.

56.     Similarly, during an investor/analyst conference call and web hosting held by the Company on or about July 27, 2010, and through a PowerPoint presentation that was presented and/or discussed during that conference call, one or more of the Individual Defendants caused the Company to highlight the "Americas improvement" as part of the Company's "continued momentum," and how the "Americas [are] leading improvement" in the Company's C2C business segment.  Further, a slide in the PowerPoint presentation specifically addressing the Company's C2C Americas business touted how the C2C Americas revenue generated "32% of Western Union revenue," how "momentum continued from recent quarters" in the region, and further emphasized a "positive quarter for Mexico" and a "solid performance in U.S. outbound."

57.     Thereafter, on or about August 4, 2010, one or more of the Individual Defendants caused the Company to file with the SEC the Company's Form 10-Q Quarterly Report for Q2 2010. The Form 10-Q included a signed certification by Scheirman, which was identical, or substantially and materially identical, to the certification set forth in paragraph 51 above.

58.     Regarding the Company's C2C business in the Americas, one or more of the Individual Defendants caused the Company to state in the August 4, 2010 Form 10-Q (in relevant part):

> The Americas region (including North America, Latin America, the Caribbean and South America) of our consumer-to-consumer segment represented 32% of our total consolidated revenue for both the three and six months ended June 30, 2010. For the three months ended June 30, 2010, the Americas revenue increased due to strong transaction growth, although the increase was partially offset by the impact of pricing actions taken in our domestic

business in the fourth quarter of 2009. For the six months ended June 30, 2010, revenue declined despite transaction growth due to the pricing actions previously described.

....

Americas revenue increased 1% due to transaction growth of 12% for the three months ended June 30, 2010 compared to the same period in 2009, but transaction growth was offset by pricing actions taken in the domestic business in the fourth quarter of 2009. For the six months ended June 30, 2010 compared to the same period in 2009, revenue declined despite transaction growth also due to the pricing actions taken in the fourth quarter of 2009. Our domestic business experienced revenue declines of 10% and 12% on transaction growth of 28% and 23% for the three and six months ended June 30, 2010, respectively, due to the same factors. Our United States outbound business experienced both transaction and revenue growth in the three and six months ended June 30, 2010. Our Mexico business contributed to revenue growth in the Americas region during the three months ended June 30, 2010 with revenue and transaction growth of 4% and 5%, respectively. For the six months ended June 30, 2010, Mexico revenue declined 1% on transaction growth of 1%.

59.     Further, regarding "Litigation and Related Contingencies," one or more of

the Individual Defendants caused the Company to report in the August 4, 2010 Form

10-Q (in relevant part):

During the third quarter of 2009, the Company recorded an accrual of $71.0 million for an anticipated agreement and settlement with the State of Arizona. On February 11, 2010, the Company signed this agreement and settlement, which resolved all outstanding legal issues and claims with the State and requires the Company to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico will participate with Arizona. The accrual includes amounts for reimbursement to the State of Arizona for its costs associated with this matter. In addition, as part of the agreement and settlement, the Company expects to make certain investments in its compliance programs along the United States and Mexico border and to engage a monitor for that program, which are expected to cost up to $23 million over the next two to four years. During the six months ended June 30, 2010, cash payments of $41 million were made related to the agreement and settlement.

60.    Thus, through the July 27, 2010 press release and presentation regarding the Company's Q2 2010 earnings, and through the August 4, 2010 Form 10-Q, one or more of the Individual Defendants continued to cause the Company to emphasize the positive momentum and improving trends in the Company's C2C business involving the Americas (and Mexico in particular), and to continue to represent that the Arizona Settlement Agreement "resolved all outstanding legal issues and claims" with the state of Arizona and would only cost the Company up to $23 million over the next four years. Again, the Individual Defendants gave no indication that the positive C2C Americas/Mexico trends were at all at risk due to the Company's actual or likely burdens and obligations under the Arizona Settlement Agreement.

61.    On or about September 29, 2010, one or more of the Individual Defendants caused the Company to publish a press release announcing the Company's estimated Q3 business trends in advance of a September 30, 2010 "Investor Day" held by the Company.   Regarding the Company's C2C business segment, one or more of the Individual Defendants caused the Company to represent in the September 29, 2010 press release (in part):

> The Company's consumer-to-consumer revenue increased 1%, while constant currency revenue increased 3%. Transactions increased 10%. Constant currency revenue and transaction growth rates each improved approximately one percentage point compared to the second quarter.
>
> The Company's international transactions increased 7%, domestic money transfer transactions increased 35% and Mexico transactions increased 2%.

62.    Further, the September 29, 2010 press release quoted Ersek as follows:

"We have made good progress this year, and we continue to have solid transaction growth," said Western Union President and CEO, Hikmet Ersek.

Ersek added, "I am pleased with our recent performance and strongly believe in the long-term opportunities to build on our strengths. We look forward to sharing with investors our strategies to grow core money transfer, expand electronic channels, further develop our portfolio of services, and improve productivity."

63.     The next day, on September 30, 2010, the Company held its planned "Investor Day," at which one or more of the Individual Defendants caused the Company to make numerous presentations regarding the Company's business and growth prospects.  In particular, through a PowerPoint presentation that was presented and/or discussed during the September 30, 2010 Investor Day, regarding the Company's U.S. to Mexico C2C business, one or more of the Individual Defendants caused the Company to highlight "[i]mproving trends vs. Banco de Mexico," "optimization of in country network for cash out," and the Company's "3 Brand strategy addressing premium vs. value consumer segments."  The PowerPoint presentation also included a graph, positively depicting the improving transaction growth rate for Mexico.  Regarding any regulatory challenges in Mexico, the PowerPoint presentation simply represented that the Company was "[a]ddressing [the] regulatory environment" in Mexico.  More broadly, however, in touting the Company's "competitive advantages," the Individual Defendants caused the Company to tout the Company's purported "anti-money Laundering (AML) and regulatory expertise."

64.     Thereafter, on or about October 26, 2010, one or more of the Individual Defendants caused the Company to publish a press release announcing the Company's earnings for Q3 2010.  Among the "operational highlights for the quarter,"

the October 26, 2010 press release emphasized the "growth in global consumer-to-consumer (C2C) transactions of 10%, with continued solid performance in each region." Further, regarding the Company's C2C Americas business, one or more of the Individual Defendants caused the Company to represent in the October 26, 2010 press release:

> The Americas region increased revenue 2% on transaction growth of 13%. The region's strong transaction performance was driven by faster growth in U.S. domestic money transfer and continued strength in U.S.-originated transactions to the rest of the world. Domestic transactions increased 35%, while revenue declined 6%. Mexico revenue declined 1% as transactions grew 2%.

65.     Similarly, during an investor/analyst conference call and web hosting held by the Company on or about October 26, 2010, and through a PowerPoint presentation that was presented and/or discussed during that conference call, one or more of the Individual Defendants caused the Company to tout the Company's "10% C2C transaction growth in Q3" and the "steady to improved trends across all regions." Further, a PowerPoint slide specifically addressing the Company's C2C Americas business highlighted how the Company's C2C Americas business generated "32% of Western Union Revenue," touted how "momentum continued in the region," emphasized "strong U.S. outbound results," and highlighted "2% Mexico transaction growth."

66.     Thereafter, on or about November 5, 2010, one or more of the Individual Defendants caused the Company to file with the SEC the Company's Form 10-Q Quarterly Report for Q3 2010.  The Form 10-Q included signed certifications by Ersek and Scheirman, which were identical, or substantially and materially identical, to the certifications set forth in paragraph 51 above.

67.     Regarding the Company's C2C Americas business, one or more of the Individual Defendants caused the Company to state in the November 5, 2010 Form 10-Q (in relevant part):

> The Americas region (including North America, Latin America, the Caribbean and South America) of our consumer-to-consumer segment represented 32% of our total consolidated revenue for both the three and nine months ended September 30, 2010. For the three months ended September 30, 2010, the Americas revenue increased due to strong transaction growth, although the increase was mostly offset by the impact of pricing actions taken in our domestic business commencing in the fourth quarter of 2009. For the nine months ended September 30, 2010, revenue was flat despite transaction growth due to the pricing actions previously described.

68.     Further, regarding "Litigation and Related Contingencies," one or more of the Individual Defendants caused the Company to represent in the November 5, 2010 Form 10-Q:

> During the third quarter of 2009, the Company recorded an accrual of $71.0 million for an agreement and settlement with the State of Arizona and other states. On February 11, 2010, the Company signed this agreement and settlement, which resolved all outstanding legal issues and claims with the State and requires the Company to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico are participating with Arizona. The accrual includes amounts for reimbursement to the State of Arizona for its costs associated with this matter. In addition, as part of the agreement and settlement, the Company has made and expects to make certain investments in its compliance programs along the United States and Mexico border and has engaged a monitor for those programs, which are expected to cost up to $23 million over the period from signing to 2013. During the nine months ended September 30, 2010, cash payments of $65.0 million were made related to the agreement and settlement.

69.     In short, again through the October 26, 2010 press release and presentation regarding the Company's Q3 2010 earnings, and through the November

5, 2010 Form 10-Q, one or more of the Individual Defendants caused the Company to continue to portray a positive picture and tout the positive momentum and improving trends in the Company's C2C business involving the Americas (and Mexico in particular), and to continue to represent that the Arizona Settlement Agreement "resolved all outstanding legal issues and claims" with the state of Arizona and would only cost the Company up to $23 million over the next four years.  Once again, the Individual Defendants gave no indication that the positive C2C Americas/Mexico trends were at all at risk due to the Company's actual or likely burdens and obligations under the Arizona Settlement Agreement.

70.     Thereafter, on or about February 1, 2011, one or more of the Individual Defendants caused the Company to publish a press release announcing the Company's earnings for Q4 2010 and the fiscal year ended December 31, 2010.  For Q4 2010, the press release highlighted "[r]evenue of $1.4 billion, an increase of 3% compared to last year's fourth quarter."  Further, regarding the Company's business in its Americas region for Q4 2010, one or more of the Individual Defendants caused the Company to highlight: "The Americas region increased revenue 7% on transaction growth of 11%. Growth in U.S. domestic money transfer and continued strength in U.S. Outbound to the rest of the world contributed to the improvement. Domestic revenue increased 7%, on transaction growth of 29%. Mexico revenue and transactions each grew 3% in the quarter."

71.     The February 1, 2011 press release further quoted Ersek, as follows:

> "We had a strong finish to 2010. Our consumer-to-consumer
> revenue trends accelerated, including the expected turnaround in
> U.S. domestic money transfer. For the year, we generated $1 billion
> in cash flow from operations, and returned $750 million to

shareholders through stock repurchase and dividends. We also made progress on our key strategic priorities of growing retail channels, expanding electronic channels, developing our product portfolio, and improving processes and productivity."

72.    Similarly, during an investor/analyst conference call and web hosting held by the Company on or about February 1, 2011, and through a PowerPoint presentation that was presented and/or discussed during that conference call, one or more of the Individual Defendants caused the Company to continue to highlight the positive trends in the Company's C2C Americas region business, including Mexico.  Specifically, a PowerPoint slide directed towards the C2C Americas segment touted a revenue increase of 7% and a transactions increase of 11%, and further highlighted how the C2C segment generated "32% of Western Union revenue," how "U.S. domestic repositioning [was] driving new business."  Further, the slide touted "continued solid U.S. outbound performance" and a "Mexico 3% transaction and revenue growth."

73.    Thereafter, on or about February 25, 2011, one or more of the Individual Defendants caused the Company to file with the SEC the Company's Form 10-K Annual Report for the fiscal year ended December 31, 2010.  The Form 10-K was signed by Scheirman and the Director Defendants (with the exception of Trujillo).  The Form 10-K included signed certifications by Ersek and Scheirman, which were identical, or substantially and materially identical, to the certifications set forth in paragraph 51 above.  Additionally, the Form 10-K included a "Certification of Chief Executive Officer and Chief Financial Officer," signed by Ersek and Scheirman, which represented as follows:

The certification set forth below is being submitted in connection with the Annual Report of The Western Union Company on Form 10-K for the period ended December 31, 2010 (the "Report") for the

purpose of complying with Rule 13a-14(b) or Rule 15d-14(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Section 1350 of Chapter 63 of Title 18 of the United States Code.

Hikmet Ersek and Scott T. Scheirman certify that, to the best of each of their knowledge:

1.  The Report fully complies with the requirements of Sections 13(a) or 15(d) of the Exchange Act; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of The Western Union Company.

74.   Regarding the Company's performance in the C2C Americas segment, one or more of the Individual Defendants caused the Company to state in the February 25, 2011 Form 10-K:

> The Americas region (including North America, Latin America, the Caribbean and South America) of our consumer-to-consumer segment, which represented 31% of our total consolidated revenue for the year ended December 31, 2010, experienced revenue increases due to strong transaction growth, although the increase was mostly offset by the impact of pricing actions taken in our domestic business in the fourth quarter of 2009.

75.   Also regarding the Company's performance in the C2C Americas segment, one or more of the Individual Defendants caused the Company to state in the February 25, 2011 Form 10-K:

> Americas revenue increased 2% on transaction growth of 11% for the year ended December 31, 2010 compared to the prior year due to the pricing actions taken in the domestic business commencing in the fourth quarter of 2009. Our domestic business experienced revenue declines of 6% on transaction growth of 28% for the year ended December 31, 2010 due to the same factors. However, in the fourth quarter of 2010, our domestic business experienced revenue growth of 7% on transaction growth of 29% as we reached the anniversary of the pricing reductions taken in the fourth quarter of 2009. Our United States outbound business experienced both transaction and revenue growth in the year ended December 31,

2010. Our Mexico business revenue was flat during the year ended December 31, 2010 on transaction growth of 2%.

76.     Further, regarding the Arizona Settlement Agreement, one or more of the

Individual Defendants caused the Company to state in the February 25, 2011 Form 10-

K:

> In February 2010, we signed an agreement and settlement with the State of Arizona and other states regarding claims concerning our ability to prevent our service from being abused by some users to launder money or to facilitate other criminal activity. The agreement and settlement resolved all outstanding legal issues and claims with the State. In addition to certain investments in, and changes to, our anti-money laundering compliance obligations in the region during the term of the agreement, we are required to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico will participate with Arizona. The settlement relates to a number of lawsuits in which we and the State of Arizona were parties. The issues in those cases related to subpoenas for transaction data and the State's attempt to seize money transfers originated in states other than Arizona and intended for payment in Mexico….

77.     Also regarding the Arizona Settlement Agreement, one or more of the

Individual Defendants caused the Company to state in the February 25, 2011 Form 10-

K:

> During the year ended December 31, 2009, we recorded an accrual of $71.0 million for an agreement and settlement with the State of Arizona and other states. On February 11, 2010, we signed this agreement and settlement, which resolved all outstanding legal issues and claims with the State and requires us to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico will participate with Arizona. The accrual includes amounts for reimbursement to the State of Arizona for its costs associated with this matter. In addition, as part of the agreement and settlement, we expect to make certain investments in our compliance programs along the United States and Mexico border and have engaged a monitor for those programs, which are

expected to cost up to $23 million over the period from signing to 2013.

78.     Finally, through the February 25, 2011 Form 10-K, one or more of the Individual Defendants caused the Company to (purportedly) identify "[p]ossible events or factors that could cause results or performance to differ materially from those expressed in our forward-looking statements."   Regarding the Arizona Settlement Agreement, the Individual Defendants caused the Company merely to identify – among myriad other purported, generically-described risk factors – the "failure to comply with the settlement agreement with the State of Arizona" as a risk factor, without providing any detail or meaningful explanation or disclosure about the nature, extent, and scope of this purported risk.

79.     Thereafter, on or about April 26, 2011, one or more of the Individual Defendants caused the Company to publish a press release announcing the Company's earnings for Q1 2011.   The press release touted the Company's "Consumer-to-Consumer (C2C) reported and constant currency revenue increase of 5% on transaction growth of 7%," and further highlighted the C2C "Americas region revenue increase of 6% on transaction growth of 8%."   Further, the press release quoted Ersek as follows:

> The first quarter results demonstrate the benefits of our diversified business, with presence in more than 200 countries and territories. Strong revenue growth in Asia Pacific and solid increases in the Americas and much of Europe helped deliver another good quarter. Our U.S. domestic money transfer growth trends continued, bill payments revenue declines slowed, and Western Union Business Solutions provided strong growth.

80.     Similarly, during an investor/analyst conference call and web hosting held by the Company on or about April 26, 2011, and through a PowerPoint presentation

that was presented and/or discussed during that conference call, one or more of the Individual Defendants caused the Company to promote the "good start to 2011" and how "strong trends" were continuing in the Company's C2C business.  Specifically regarding the C2C Americas business, the PowerPoint presentation included a slide emphasizing a 6% increase in revenues and an 8% increase in transactions, further noting how C2C Americas for the quarter constituted "32% of Western Union revenue," and highlighting how "Mexico grew revenue and transactions 1%" for the quarter.

81.     Thereafter, on or about May 4, 2011, one or more of the Individual Defendants caused the Company to file with the SEC the Company's Form 10-Q Quarterly Report for Q1 2011.  The Form 10-Q included signed certifications by Ersek and Scheirman, which were identical, or substantially and materially identical, to the certifications set forth in paragraph 51 above.

82.     Regarding the Company's C2C Americas business, one or more of the Individual Defendants caused the Company to state in the May 4, 2011 Form 10-Q (in relevant part):

> The Americas region (including North America, Latin America, the Caribbean and South America) of our consumer-to-consumer segment represented 32% of our total consolidated revenue for the three months ended March 31, 2011. Americas experienced revenue growth primarily driven by transaction growth.
>
> ....
>
> Americas revenue increased 6% due to transaction growth of 8% for the three months ended March 31, 2011 compared to the same period in 2010. Our domestic business experienced revenue growth of 8% due to transaction growth of 21% for the three months ended March 31, 2011. Transaction growth in our domestic business was higher than revenue growth due to transaction growth being greater in lower principal bands, which have a lower revenue per transaction. Our United States outbound business experienced

both transaction and revenue growth in the three months ended March 31, 2011. During the three months ended March 31, 2011, our Mexico business had both revenue and transaction growth of 1%.

83.    Further, regarding "Litigation and Related Contingencies," one or more of

the Individual Defendants caused the Company to state in the May 4, 2011 Form 10-Q

(in relevant part):

> On February 11, 2010, the Company signed an agreement and settlement, which resolved all outstanding legal issues and claims with the State of Arizona and requires the Company to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico are participating with Arizona. The accrual includes amounts for reimbursement to the State of Arizona for its costs associated with this matter. In addition, as part of the agreement and settlement, the Company has made and expects to make certain investments in its compliance programs along the United States and Mexico border and has engaged a monitor for those programs, which are expected to cost up to $23 million over the period from signing to 2013.

84.    In sum, through the April 26, 2011 press release and presentation

regarding the Company's Q1 2011 earnings, and through the May 4, 2011 Form 10-Q,

one or more of the Individual Defendants continued to cause the Company to portray a

positive picture regarding the positive momentum, improving trends, and growing

revenue for the Company's C2C business involving the Americas (and Mexico in

particular), and to continue to represent that the Arizona Settlement Agreement

"resolved all outstanding legal issues and claims" with the state of Arizona and would

only cost the Company up to $23 million over the next four years.  And, now well over a

year after the Company executed the Arizona Settlement Agreement and a monitor

was put in place under that agreement, the Individual Defendants still gave no

indication that the positive C2C Americas/Mexico trends were at all at risk due to the

Company's actual or likely burdens and obligations under the Arizona Settlement Agreement.

85.    Thereafter, on or about July 26, 2011, one or more of the Individual Defendants caused the Company to publish a press release announcing the Company's earnings for Q2 2011.   Through the press release, one or more of the Individual Defendants caused the Company to highlight a "Consumer-to-consumer (C2C) revenue increase of 8% reported and 5% constant currency on transaction growth of 6%," and an "Americas region revenue increase of 5% on transaction growth of 7%."

86.    Similarly, during an investor/analyst conference call and web hosting held by the Company on or about July 26, 2011, and through a PowerPoint presentation that was presented and/or discussed during that conference call, one or more of the Individual Defendants caused the Company to emphasize how "strong trends continue[d] in C2C," and to reaffirm that the Company was "raising 2011 revenue and EPS outlook."   Specifically regarding the C2C Americas business, the PowerPoint presentation included a slide emphasizing a 5% increase in revenues and a 7% increase in transactions, and further noted that C2C Americas revenue for the quarter again constituted "32% of Western Union revenue," and noted how "Mexico grew revenue 1% while transactions declined 1%" for the quarter.

87.    Thereafter, on or about August 2, 2011, one or more of the Individual Defendants caused the Company to file with the SEC the Company's Form 10-Q Quarterly Report for Q2 2011.   The Form 10-Q included signed certifications by Ersek

and Scheirman, which were identical, or substantially and materially identical, to the certifications set forth in paragraph 51 above.

88.    Regarding the Company's C2C Americas region business, one or more of the Individual Defendants caused the Company to state in the August 2, 2011 Form 10-Q (in relevant part):

> The Americas region (including North America, Latin America, the Caribbean and South America) of our consumer-to-consumer segment represented 32% of our total consolidated revenue for both the three and six months ended June 30, 2011. For the three and six months ended June 30, 2011, the Americas experienced revenue growth primarily driven by transaction growth, slightly offset by pricing reductions.
>
> ….
>
> Americas revenue increased 5% and 6%, respectively, due to transaction growth of 7% for both the three and six months ended June 30, 2011 compared to the same periods in 2010. For both the three and six months ended June 30, 2011, transaction growth was partially offset by slight price reductions. Our domestic business experienced revenue growth of 9% and 8% for the three and six months ended June 30, 2011, respectively, due to transaction growth of 19% and 20%, respectively. Transaction growth in our domestic business was higher than revenue growth due to transaction growth being greater in lower principal bands, which have a lower revenue per transaction. Our United States outbound business experienced both transaction and revenue growth in the three and six months ended June 30, 2011. Mexico revenue increased 1% for both the three and six months ended June 30, 2011, respectively on transaction decline of 1% for the three months ended June 30, 2011, and flat transactions for the six months ended June 30, 2011.

89.    Further, regarding "Litigation and Related Contingencies," one or more of the Individual Defendants caused the Company to state in the August 2, 2011 Form 10-Q (in relevant part):

> On February 11, 2010, the Company signed an agreement and settlement, which resolved all outstanding legal issues and claims

with the State of Arizona and requires the Company to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico are participating with Arizona. The accrual includes amounts for reimbursement to the State of Arizona for its costs associated with this matter. In addition, as part of the agreement and settlement, the Company has made and expects to make certain investments in its compliance programs along the United States and Mexico border and has engaged a monitor for those programs, which are expected to cost up to $23 million over the period from signing to 2013.

90.    Thus, similar to the reporting of Q1 2011 results, through the July 26, 2011 press release and presentation regarding the Company's Q2 2011 earnings, and through the August 2, 2011 Form 10-Q, one or more of the Individual Defendants continued to cause the Company to portray a positive picture regarding the positive momentum, improving trends, and growing revenue for the Company's C2C business involving the Americas (including Mexico), and to continue to represent that the Arizona Settlement Agreement "resolved all outstanding legal issues and claims" with the state of Arizona and would only cost the Company up to $23 million over the next four years. And again, close to a year and one half after the Company executed the Arizona Settlement Agreement and a monitor was put in place under that agreement, the Individual Defendants still gave no indication that the positive C2C Americas/Mexico trends were at all at risk due to the Company's actual or likely burdens and obligations under the Arizona Settlement Agreement.

91.    Thereafter, on or about October 25, 2011, one or more of the Individual Defendants caused the Company to publish a press release announcing the Company's earnings for Q3 2011.   Regarding the Company's C2C revenue and transactions for the quarter, the press release highlighted a "revenue increase of 6%

reported and 4% constant currency on transaction growth of 5%," and touted an "Americas region revenue increase of 6% on transaction growth of 6%."  Further, the October 25, 2011 press release quoted Ersek as follows:

> Our business continues to demonstrate its resilience, with revenue growth in each of our major regions and businesses. Consumer-to-consumer trends remained solid, bill payments revenue grew for the second consecutive quarter, and business-to-business payments delivered very strong results, with reported revenue growth of 30%. We are on track to deliver our revenue and earnings per share outlook for the year.

92.     Similarly, during an investor/analyst conference call and web hosting held by the Company on or about October 25, 2011, and through a PowerPoint presentation that was presented and/or discussed during that conference call, one or more of the Individual Defendants caused the Company to highlight, among the "Q3 Highlights," how the "[s]olid trends continue[d] in C2C." Specifically regarding the C2C Americas business, the PowerPoint presentation included a slide emphasizing a 6% increase in revenue and an 6% increase in transactions, further noted that C2C Americas revenue for the quarter again constituted "31% of Western Union revenue," and noted how "Mexico grew revenue 5% while transactions increased 2%" for the quarter.

93.     Thereafter, on or about November 3, 2011, one or more of the Individual Defendants caused the Company to file with the SEC the Company's Form 10-Q Quarterly Report for Q3 2011.  The Form 10-Q included signed certifications by Ersek and Scheirman, which were identical, or substantially and materially identical, to the certifications set forth in paragraph 51 above.

94.     Regarding the Company's C2C business in the Americas region, one or more of the Individual Defendants caused the Company to state in the November 3, 2011 Form 10-Q (in relevant part):

> The Americas region (including North America, Central America, the Caribbean and South America) of our consumer-to-consumer segment represented 31% and 32% of our total consolidated revenue for the three and nine months ended September 30, 2011, respectively. For the three and nine months ended September 30, 2011, the Americas experienced revenue growth due to transaction growth, slightly offset by pricing reductions.
>
> ….
>
> Americas revenue increased 6% for both the three and nine months ended September 30, 2011, compared to the same periods in 2010 due to transaction growth of 6% and 7%, respectively. For both the three and nine months ended September 30, 2011, transaction growth was partially offset by slight price reductions. Our domestic business experienced revenue growth of 9% and 8% for the three and nine months ended September 30, 2011, respectively, due to transaction growth of 14% and 18%, respectively. Transaction growth in our domestic business was higher than revenue growth due to transaction growth being greater in lower principal bands, which have a lower revenue per transaction. Our United States outbound business experienced both transaction and revenue growth in the three and nine months ended September 30, 2011. Mexico revenue increased 5% and 2%, respectively, for the three and nine months ended September 30, 2011, on transaction growth of 2% for the three months ended September 30, 2011, and flat transactions for the nine months ended September 30, 2011.

95.     Further, regarding "Litigation and Related Contingencies," one or more of the Individual Defendants caused the Company to state in the November 3, 2011 Form 10-Q (in relevant part):

> On February 11, 2010, the Company signed an agreement and settlement, which resolved all outstanding legal issues and claims with the State of Arizona and requires the Company to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico are participating with Arizona. The accrual

includes amounts for reimbursement to the State of Arizona for its costs associated with this matter. In addition, as part of the agreement and settlement, the Company has made and expects to make certain investments in its compliance programs along the United States and Mexico border and has engaged a monitor for those programs, which are expected to cost up to $23 million over the period from signing to 2013.

96.     In short, again through the October 25, 2011 press release and presentation regarding the Company's Q3 2011 earnings, and through the November 3, 2011 Form 10-Q, as they had done throughout 2011, one or more of the Individual Defendants continued to cause the Company to portray a positive picture regarding the positive momentum, improving trends, and growing revenue for the Company's C2C business involving the Americas (including Mexico), and to continue to represent that the Arizona Settlement Agreement "resolved all outstanding legal issues and claims" with the state of Arizona and would only cost the Company up to $23 million over the next four years.   And, now well over a year and one half after the Company executed the Arizona Settlement Agreement and a monitor was put in place under that agreement, the Individual Defendants still gave no indication that the positive C2C Americas/Mexico trends were at all at risk due to the Company's actual or likely burdens and obligations under the Arizona Settlement Agreement.

### D.     The Truth is Slowly Revealed

97.     Thereafter, on or about February 7, 2012, one or more of the Individual Defendants caused the Company to publish a press release announcing the Company's earnings for Q4 2011 and the fiscal year ended December 31, 2011. Regarding the Company's C2C revenue and transactions for the quarter, the press release highlighted a "revenue increase of 3% reported and 3% constant currency on

transaction growth of 5%," and touted an "Americas region revenue increase of 3% on transaction growth of 6%."  Further, the February 7, 2012 press release quoted Ersek as follows:

> "We realized many accomplishments in 2011. We exceeded our initial outlook for earnings per share, and delivered our highest full year revenue growth rate since 2008. Each of our consumer-to-consumer regions grew, with strong performance in electronic channels. Consumer bill payments continued its turnaround, and Western Union Business Solutions delivered double-digit revenue growth. We also returned $1 billion to shareholders through share repurchase and dividends."

> Ersek continued, "In 2011 we further identified our long-term opportunities and needs, and created the strategic roadmaps that will drive our future growth. We structured our business around three growth areas: core consumer money transfer, business-to-business payments, and new ventures and services, including further expansion of electronic channels. We acquired two major super-agents, furthering our European consumer strategies, and expanded our agent network to 485,000 locations. We also completed the acquisition of Travelex Global Business Payments, which in combination with our existing Western Union Business Solutions gives us a strong foundation for growth in SME business-to-business payments."

> Ersek added, "In 2012 our focus is on execution against the strategic roadmaps. While there are some near-term market challenges in parts of the world, the long-term opportunities for revenue growth and margin expansion are strong. We are committed to investing in our business to realize these opportunities, including building our business-to-business foundation and further developing our separate digital business in San Francisco, which will allow us to achieve true leadership and scale in e-channels. We also remain focused on generating and deploying strong cash flow, and today's announcement that we will be raising our quarterly dividend to ten cents per share reflects that commitment."

98.    Further, regarding the Company's 2012 outlook, one or more of the Individual Defendants caused the Company to state as follows in the February 7, 2012 press release:

The Company expects the following financial outlook for 2012:

Revenue

- Constant currency revenue growth range of +6% to +8%, including a +4% benefit from the full year inclusion of TGBP

- GAAP revenue growth 2% lower than constant currency, due to the significant strengthening of the U.S. dollar relative to European and other currencies compared to 2011

The Company generally expects overall consumer-to-consumer constant currency revenue trends to be similar to the fourth quarter of 2011, and anticipates softness in Europe in 2012. The Company expects low double-digit constant currency revenue growth in Western Union Business Solutions, compared to pro forma full year 2011 results (TGBP was acquired November 7, 2011).

99.     Similarly, during an investor/analyst conference call and web hosting held by the Company on or about February 7, 2012, and through a PowerPoint presentation that was presented and/or discussed during that conference call, one or more of the Individual Defendants continued to cause the Company to continue to highlight the positive trends in the Company's C2C Americas region business, including Mexico. Specifically, a PowerPoint slide directed towards the C2C Americas segment touted a revenue increase of 3% and a transactions increase 6%, and further noted that C2C Americas revenue for the quarter again constituted "31% of Western Union revenue," that "domestic money transfer grew 7% and transactions 11%," that "Mexico revenue declined 1% while transactions increased 1%," and that "U.S. outbound revenue growth improved from Q3."   Finally, regarding "2012 Outlook – Revenues," the February 7, 2012 PowerPoint stated: "Consumer-to-consumer trends [are] expected to be similar to fourth quarter 2011."

100.   Thereafter, on or about February 24, 2012, one or more of the Individual Defendants caused the Company to file with the SEC the Company's Form 10-K Annual Report for the fiscal year ended December 31, 2011.   The Form 10-K was signed by Scheirman and the Director Defendants (with the exception of Trujillo).   The Form 10-K included signed certifications by Ersek and Scheirman, which were identical, or substantially and materially identical, to the certifications set forth in paragraph 51 above.   Additionally, the Form 10-K included a "Certification of Chief Executive Officer and Chief Financial Officer," which was identical, or substantially and materially identical, to the certification set forth in paragraph 73 above.

101.   Regarding the Company's performance in the C2C Americas segment, one or more of the Individual Defendants caused the Company to state in the February 24, 2012 Form 10-K:

> Americas revenue increased 5% due to transaction growth of 6% for the year ended December 31, 2011 compared to the same period in 2010. Our domestic business experienced revenue growth of 8% for the year ended December 31, 2011 due to transaction growth of 16%. Transaction growth in our domestic business was higher than revenue growth due to transaction growth being greater in lower principal bands, which have lower revenue per transaction. Our United States outbound business experienced both transaction and revenue growth in the year ended December 31, 2011. Mexico revenue increased 2% on flat transactions for the year ended December 31, 2011. Our Mexico business is being affected by on-going changes to our compliance procedures related to the agreement and settlement with the State of Arizona and other states. These changes are expected to cause our Mexico business to decline in 2012.

102.   Further, in the "Events Related to Our Regulatory and Litigation Environment" section of the February 24, 2012 Form 10-K, and more specifically

regarding the Arizona Settlement Agreement, one or more of the Individual Defendants

caused the Company to report:

> We have developed and continue to enhance global compliance programs to monitor and to address various legal and regulatory requirements. Our money transfer network operates through third-party agents in most countries, and our legal and practical ability to control those agents' compliance activities is limited. To assist in managing and monitoring money laundering and terrorist financing risks, we have developed and continue to enhance our global compliance programs, including an anti-money laundering compliance program, which comprises policies, procedures, systems and internal controls. We have employees in a number of our offices around the world dedicated to our global compliance program efforts. In connection with an agreement and settlement with the State of Arizona and other states entered into in February 2010, we have funded $71 million, a portion of which was paid to a not-for-profit organization to promote safety and security along the entire United States and Mexico border, with the rest paid to the State of Arizona for its costs associated with this matter. This agreement and settlement also resolved all outstanding legal issues and claims with the State of Arizona. In addition, as part of the agreement and settlement, we have made and expect to make certain investments in our compliance programs along the United States and Mexico border and a monitor has been engaged for those programs. The costs of the investments in our programs and for the monitor are expected to reach up to $23 million over the period from signing to 2013. See also Item 1A, Risk Factors—*"Western Union is the subject of governmental investigations and consent agreements with or enforcement actions by regulators"* for more information on this agreement and settlement, including the potential impact on our business.

103.   Elsewhere in the February 24, 2012 Form 10-K, again regarding the

Arizona Settlement Agreement in a discussion section titled *"Western Union is the*

*subject of governmental investigations and consent agreements with or enforcement*

*actions by regulators*," one or more of the Individual Defendants caused the Company

to report as follows:

> On February 11, 2010, we signed an agreement and settlement, which resolved all outstanding legal issues and claims with the

State of Arizona and required us to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico are participating with Arizona. The agreement also required us to make payments to the State of Arizona for its costs associated with this matter. In addition, as part of the agreement and settlement, we have made and expect to make certain investments in and changes to our compliance programs along the United States and Mexico border and a monitor has been engaged for those programs. The costs of the investments in our programs and for the monitor are expected to reach up to $23 million over the period from signing to 2013. The monitor has made a number of recommendations related to our compliance programs.

We are in the process of making certain changes to our compliance program for transactions from the United States to Mexico, including:

- revisions to agent agreements to increase our ability to oversee the compliance of our agents and subagents;

- reduced thresholds at which our consumers are required to provide identification for transactions from certain states along the United States southwest border; and

- enhancement of our information systems including migrating customer information for our Western Union, Orlandi Valuta and Vigo brands onto a common database and migrating to a standard point of sale system.

Such changes will likely have an adverse effect on our United States to Mexico business. Any additional changes that we elect or are required to make in the United States to Mexico corridor, or similar changes that we may elect or be required to make in other corridors, could have a material adverse effect on our business, financial condition or results of operations.

104. Elsewhere in the February 24, 2012 Form 10-K, however, again regarding the Arizona Settlement Agreement, one or more of the Individual Defendants caused the Company to report as follows:

During 2009, the Company recorded an accrual of $71.0 million for an agreement and settlement with the State of Arizona and other states, which was paid in 2010. On February 11, 2010, the Company signed this agreement and settlement, which resolved all outstanding legal issues and claims with the State of Arizona and required the Company to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico are participating with Arizona. The accrual included amounts for reimbursement to the State of Arizona for its costs associated with this matter. In addition, as part of the agreement and settlement, the Company has made and expects to make certain investments in its compliance programs along the United States and Mexico border and a monitor has been engaged for those programs. The costs of the investments in the Company's programs and for the monitor are expected to reach up to $23 million over the period from signing to 2013.

105. Thus, for the first time in the February 24, 2012 Form 10-K – over two years after the Company signed the Arizona Settlement Agreement and the monitor was appointed under that agreement – one or more of the Individual Defendants caused the Company to state that changes to its business being implemented as part of the Company's efforts to comply with the Arizona Settlement Agreement would likely impact its C2C business involving Mexico.  But the Individual Defendants gave little detail regarding the nature or extent of the likely impact, or warn that the Company would likely have to end relationships with thousands of non-compliant agents in Mexico.  Nor did the Individual Defendants cause the Company to disclose any likely adverse impact the Company's compliance efforts may have on the Company's C2C business involving Latin America.  Finally, one or more of the Individual Defendants continued to cause the Company to maintain that the Company's costs in complying with the Arizona Settlement Agreement would only extend up to $23 million.

106.   About three weeks later, on or about March 13, 2012, Western Union participated in and presented at a Credit Suisse Global Services conference for investors and analysts.   During that meeting, Scheirman expressed continued confidence in the momentum of Western Union's C2C business, both the segment's core strategy and its continued ability to withstand and moderate competitive and pricing pressures:

> [SCHEIRMAN:] … [W]e are very confident in the core C2C business model. And it might be helpful to share a little bit of our strategies and where we're heading in this area.  But clearly if you just look over the last 10 years and using I-80 as our source, that every year we've continued to gain market share, each of the years over the last 10 years. And today our share stands at about 18%. And we believe we have opportunities to continue to grow that share.
>
> ….
>
> Credit Suisse [ANALYST:]  So not to put you on the spot, but do you think it's a 5% growth over a long period of time, is it – can you grow faster, can you accelerate the growth?
>
> [SCHEIRMAN:]  Clearly, our objective is we want to grow faster, gain market share at an accelerated pace, although we don't give long-term guidance for our objectives. But what I would point you towards, Jim, is I-80, if you just look at near term, 2011, 2012, they estimate the cross-border remittance market is growing in that 5% range. We clearly feel like there's opportunities to continue to gain share at an increased pace as we move forward. So, again, no long-term objectives as far as growth rates, but we feel like very much the growth story is intact in the core business.
>
> ….
>
> Really, what we've seen over the years, go back five or 10 years, a lot of competition, many competitors in the marketplace.   And today we only stand at about an 18% share.  We do believe our brand, our agent network of 485,000 locations are really competitive strengths for us, along with our compliance programs.
>
> But specifically when it gets to pricing what we've seen there, we  manage  our business in roughly 16,000 corridors, and anytime

we adjust pricing it's really an eye to gain market share and to do the things that, if you will, drive the strongest revenue and profit growth on a long-term basis.  And a few data points, if you look at 2011 our prices were down about 1%.  If you fast forward that to the outlook we gave in February, about a month ago as part of our earnings conference, we see pricing being down 1% to 2%, so similar to what we saw in 2011.

But clearly what we feel with the combination of building our brand, evolving our product set, marketing through our loyalty program, and then some pricing adjustments here and there, we can continue to gain share as we move forward.

107.    Thereafter, on or about April 24, 2012, one or more of the Individual Defendants caused the Company to publish a press release announcing the Company's earnings for Q1 2012.   Regarding the Company's C2C revenue and transactions for the quarter, the press release highlighted a "revenue increase of 4% reported and 5% constant currency on transaction growth of 7%," and touted a "North America region revenue increase of 5%" and a "Latin American and the Caribbean (LACA) region revenue increase of 2%." (As the Company announced in the PowerPoint slide presentation that was presented and/or discussed at the April 24, 2012 investor/analyst conference call and web hosting (discussed below), beginning with Q1 2012, the Company stopped reporting results for an "Americas" region, but instead broke the Americas region into two regions – the North America region (which includes Mexico) and the Latin America and the Caribbean ("LACA") region – and began reporting separate results for each region.).  Further, the April 24, 2012 press release quoted Ersek as follows:

Overall, we started off the year in line with our outlook. Our Consumer-to-Consumer segment growth accelerated compared to the fourth quarter, as strength in North America and the Middle East and Africa offset some expected softness in the Europe and

CIS region. We further expanded our global network, including increasing our U.S. banking and European retail presence, and in April we reached 500,000 Agent locations across the world.

108.   Similarly, during an investor/analyst conference call and web hosting held by the Company on or about April 24, 2012, and through a PowerPoint presentation that was presented and/or discussed during that conference call, one or more of the Individual Defendants caused the Company to highlight, among the "Q1 Highlights," how "C2C revenue growth accelerated."  Also, regarding the Company's C2C business involving the North America and LACA regions, the PowerPoint presentation included a slide emphasizing a 5% increase in revenue and 6% increase in transactions for the North America region, as well as a 2% increase in revenue and 8% increase in transactions for the LACA region.  Notably, however, the April 24, 2012 PowerPoint presentation included no specific discussion of Mexico trends or expectations.

109.   During the April 24, 2012 conference call, however, Scheirman commented on the Company's C2C North America and Mexico performance as follows:

> Turning to North America, the region's revenues increased 5% compared to 2% last quarter.  US outbound in Canada strengthened while domestic money transfer continues to have solid momentum with revenue growth of 9% on transaction growth of 12% in the quarter.  Mexico improved from last quarter with both revenue and transactions increasing 3% in the quarter.  As we mentioned in February, we are still determining and implementing changes to our compliance- related practices in Mexico.   Although we still expect to see some negative impact on the Vigo and Orlandi Valuta brands as we evolve our business model and compliance-related practices throughout the year, our Western Union brand is performing well.

110.   Also during the April 24, 2012 conference call, when asked to comment on the how the compliance situation in Mexico was progressing, Ersek commented as follows:

> … I think as we mentioned in our February earnings call, we have been working with the appointed external monitor very close to determine and appreciate changes, which we have outlined in our agreement and improvements about anti- money laundering oversight along all the border.  I think we did do some changes last year on the Vigo and on Orlandi Valuta brands and also on our brands ID threshold changes, which have impacted our high principal transfers, which we still see it.  Currently, we are also investing on the new technology changes and we have other many projects on the way.  We believe that these changes have affected our principal and market share in 2012, but we also believe that these changes are needed.  These changes are happening and we are going to be, as an industry leader, we're implementing the changes and that will also impact all the industry long-term.

111.   Thereafter, on or about May 1, 2012, one or more of the Individual Defendants caused the Company to file with the SEC the Company's Form 10-Q Quarterly Report for Q1 2012.  The Form 10-Q included signed certifications by Ersek and Scheirman, which were identical, or substantially and materially identical, to the certifications set forth in paragraph 51 above.

112.   Regarding the Company's C2C business involving the North America region for the quarter, one or more of the Individual Defendants caused the Company to state in the May 1, 2012 Form 10-Q:

> For the three months ended March 31, 2012 compared to the corresponding period in the prior year, revenue in our North America region, which represented 21% of our total consolidated revenue, increased due to transaction growth, offset by geographic and product mix. For the three months ended March 31, 2012, we experienced transaction and revenue growth in our domestic business due to transaction growth, primarily in lower principal bands. Additionally, our United States outbound and Canada outbound businesses experienced both transaction and revenue

growth in the three months ended March 31, 2012, with slight improvement in growth rates for Mexico. However, we are still determining and implementing changes to our compliance related practices for Mexico which may cause our Mexico business to decline in the remainder of 2012.

113.   Further, one or more of the Individual Defendants caused the Company to state in the "Litigation and Related Contingencies," section of the May 1, 2012 Form 10-Q (in relevant part):

On February 11, 2010, the Company signed an agreement and settlement, which resolved all outstanding legal issues and claims with the State of Arizona and required the Company to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico are participating with Arizona. The accrual included amounts for reimbursement to the State of Arizona for its costs associated with this matter. In addition, as part of the agreement and settlement, the Company has made and expects to make certain investments in its compliance programs along the United States and Mexico border and a monitor has been engaged for those programs. The costs of the investments in the Company's programs and for the monitor are expected to reach up to $23.0 million over the period from signing to 2013.

114.   Elsewhere in the May 1, 2012 Form 10-Q, again concerning the Arizona Settlement Agreement, one or more of the Individual Defendants caused the Company to include a disclosure concerning the Company's compliance efforts substantially and materially similar to the statement (quoted in paragraph 103 above) that first appeared in the Company's 2011 Annual Report.   In particular, the May 1, 2012 Form 10-Q stated (in relevant part):

On February 11, 2010, we signed an agreement and settlement, which resolved all outstanding legal issues and claims with the State of Arizona and required us to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico are participating with Arizona. The agreement also required us to make payments to the State of Arizona for its costs associated with this

- 53 -

matter. In addition, as part of the agreement and settlement, we have made and expect to make certain investments in and changes to our compliance programs along the United States and Mexico border and a monitor has been engaged for those programs. The costs of the investments in our programs and for the monitor are expected to reach up to $23 million over the period from signing to 2013. The monitor has made a number of recommendations related to our compliance programs.

We are in the process of making certain changes to our compliance program for transactions from the United States to Mexico, including:

- revisions to agent agreements to increase our ability to oversee the compliance of our agents and subagents;

- reduced thresholds at which our consumers are required to provide identification for transactions from certain states along the United States southwest border; and

- enhancement of our information systems including migrating customer information for our Western Union, Orlandi Valuta and Vigo brands onto a common database and migrating to a standard point of sale system.

Such changes will likely have an adverse effect on our United States to Mexico business.  Any additional changes that we elect or are required to make in the United States to Mexico corridor, or similar changes that we may elect or be required to make in other corridors, could have a material adverse effect on our business, financial condition or results of operations.

115.   Shortly after reporting the Company's Q1 2012 results to the SEC, on or about May 9, 2012, the Company hosted an "Investor Day" to discuss the Company's plans and strategic vision.   In connection therewith, one or more of the Individual Defendants caused the Company to prepare, present and discuss a PowerPoint presentation regarding the Company and its business.   Among the Company's purported "strengths" and "competitive advantages" emphasized in the May 9, 2012

PowerPoint presentation included the Company's purported "global AML/regulatory capabilities."

116.   Further, in the North America presentation (a subset of the May 9, 2012 PowerPoint presentation), one or more of the Individual Defendants caused the Company to tout "U.S. to Mexico" as one of the Company's "Top Corridors."   The presentation further bulleted "Investing in Mexico to accelerate growth" as among the Company's North America region strategies.

117.   Similarly, on or about June 12, 2012, Western Union participated in a William Blair and Co. LLC growth conference call for analysts, media representatives, and investors.  During the Company's presentation, Ersek touted the Company's AML and regulatory expertise and capabilities, stating (in relevant part):

> Before I discuss about our future strategies, let me talk about the core strengths of Western Union, why this company is so – what the core strengths are and, as Bob mentioned before, why the Company has this strength to be so successful on the market.  Our core strengths are four areas, big four areas.  First one is the global network.  The second one is the strong brand awareness.  The third one is the global organization and the resources that we have. And the fourth one is the regulatory and anti-money-laundering capabilities of Western Union.   All this combination gives us a unique opportunity and unique fundamentals for Western Union. And it's really – in the middle we put always the customer and build around that capabilities our business.
>
> ….
>
> One of our very strong competitive advantage is our regulatory environment, our regulatory and anti-money-laundering competency capabilities. It scares to death the competition to enter this market, the regulatory environment.  And I always say – I know it's sometimes tough, but I always say it's good that the regulatory environment, that we as Western Union have these capabilities to serve the customers and give the trust to the customers they believe at Western Union.

And we spend about $60 million yearly on the anti-money-laundering activities. We have about 600 employees really looking after the regulatory environment on the day to day. And don't forget, we are not only regulated in the US or in the UK; we are regulated in 200 countries. We do have different regulatory environment in 200 countries and Western Union has the competency to serve the customers. And it's not easy to get a money transfer license in Tajikistan. It's not easy to have a money license in Gabon and Brazil or other states I'm talking about. So it's a competitive advantage for Western Union and we are very proud of that.

118.  Thereafter, on or about July 24, 2012, one or more of the Individual Defendants caused the Company to publish a press release announcing the Company's earnings for Q2 2012. Regarding the Company's C2C revenue and transactions for the quarter, the press release reported "revenue flat on a reported basis and an increase of 3% constant currency, on transaction growth of 4%," and reported that "North America region revenue [was] flat with the prior year period." Further, the July 24, 2012 press release quoted Ersek as follows:

Overall we are on track for our full year financial outlook. In the quarter, our core consumer money transfer business, which represents over 80% of Company revenue, delivered solid 3% constant currency growth with consistent margins. The Middle East and Africa, Asia Pacific, and Latin America regions and on-line money transfer performed well, more than offsetting the impact of consumer slowdowns in Southern Europe and some expected softness in certain countries. The global diversification of our portfolio and resiliency of our consumers continue to drive revenue growth and strong cash flow, even in a challenging economic environment.

119.  Finally, regarding the Company's 2012 outlook, one or more of the Individual Defendants caused the Company to state in the July 24, 2012 press release:

The Company affirms its full year 2012 revenue and EBITDA margin outlook provided on April 24, and has increased its earnings per share outlook, primarily due to the tax benefit recorded in the second quarter. The Company has reduced its operating margin outlook due to increased compliance related costs; reduced its

Business Solutions revenue outlook; and increased its outlook for cash flow from operations due to timing of tax payments.

120.   Similarly, during an investor/analyst conference call and web hosting held by the Company on or about July 24, 2012, and through a PowerPoint presentation that was presented and/or discussed during that conference call, one or more of the Individual Defendants caused the Company to highlight, among the "Q2 Highlights," "[s]olid C2C results overall," "[f]lat revenue reported or 3% constant currency growth," and "[c]onstant C2C margins." Specifically regarding the C2C North America and LACA business for the quarter, the PowerPoint presentation included a slide highlighting 0% revenue growth on 2% transaction growth for the North America region, and 5% revenue growth on 5% transaction growth for the LACA region. The July 24, 2012 PowerPoint presentation (like the April 24, 2012 presentation for Q1 2012) included no specific depiction of Mexico trends or expectations. Scheirman, however, discussed revenue and transaction declines related to Mexico during the July 24, 2012 conference call:

> Mexico revenue declined 7% and transactions decreased 5% in the quarter. As you recall, we anticipated revenue climbs and share losses in Mexico this year, as we implement changes to our compliance related practices and business model.

121.   Ersek, also commenting on the revenue and transaction declines related to Mexico during the July 24, 2012 conference call, stated:

> Sure, let me start with some color, more color on North America, Bob.   I think, the Mexico business, North America outbound to Mexico business has been meeting our expectations.   We were expecting some slow down due to our, some changes we implemented in the southwest border area.  Don't forget that it's about 25% of our revenue is from the US outbound to Mexico is coming from the southwest border area.   25%, so it has slowed down.   We put some higher restrictions there, we put some higher

requirement for customers and I think it impacted short term our business.  Long term we believe that we're going to be upgrading and we're going to set some industry standards here.  That has been some Mexico.

122.   Finally, Scheirman added to Ersek's comments about Mexico during the

July 24, 2012 conference call:

The only thing I would add that the third component of the North America business is US outbound and it continued to experience growth in the second quarter.  Not quite as strong as the first quarter, but it was still growing.  Just to reiterate with Mexico, it's really what we expected to have some challenges in 2012.  But as we work through evolving the business model and so forth, we believe that will put us in a much stronger position on a long-term basis with Mexico.

123.   Thereafter, on or about August 2, 2012, one or more of the Individual

Defendants caused the Company to file with the SEC the Company's Form 10-Q

Quarterly Report for Q2 2012.  The Form 10-Q included signed certifications by Ersek

and Scheirman, which were identical, or substantially and materially identical, to the

certifications set forth in paragraph 51 above.

124.   Regarding the company's North America region business for the quarter,

one or more of the Individual Defendants caused the Company to disclose in the

August 2, 2012 Form 10-Q (in relevant part):

For the three and six months ended June 30, 2012, the North America region, which represented 21% of our total consolidated revenue for both periods, experienced flat revenue and revenue growth of 2%, respectively, on transaction growth of 2% and 4%, respectively, partially offset by geographic and product mix. For the three and six months ended June 30, 2012, we experienced revenue growth in our domestic business. Additionally, our United States outbound business experienced transaction and revenue growth in the three and six months ended June 30, 2012; however, transaction and revenue growth moderated in the three months ended June 30, 2012 compared to the first quarter of 2012 in both our domestic and United States outbound businesses. Our Mexico

business declined for the three and six months ended June 30, 2012, partially due to changes to our compliance related practices and business model.

125.   Further, regarding "Litigation and Related Contingencies," one or more of

the Individual Defendants caused the Company to state in the August 2, 2012 Form 10-

Q (in relevant part):

> On February 11, 2010, the Company signed an agreement and settlement, which resolved all outstanding legal issues and claims with the State of Arizona and required the Company to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico are participating with Arizona.   The accrual included amounts for reimbursement to the State of Arizona for its costs associated with this matter.   In addition, as part of the agreement and settlement, the Company has made and expects to make certain investments in its compliance programs along the United States and Mexico border and a monitor has been engaged for those programs.  The costs of the investments in the Company's programs and for the monitor are expected to be $23.0 million over the period from signing to 2013, pursuant to the terms of the agreement and settlement; however, actual costs incurred for these programs will likely exceed this amount.

126.   Elsewhere in the August 2, 2012 Form 10-Q, one or more of the

Individual Defendants caused the Company to report:

> On February 11, 2010, we signed an agreement and settlement, which resolved all outstanding legal issues and claims with the State of Arizona and required us to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico are participating with Arizona.   The agreement and settlement also required us to make payments to the State of Arizona for its costs associated with this matter.   In addition, as part of the agreement and settlement, we have made and expect to make certain investments in and changes to our compliance programs along the United States and Mexico border and a monitor has been engaged for those programs.  The costs of the investments in our programs and for the monitor are expected to be $23 million over the period from signing to 2013, pursuant to the terms of the agreement and settlement; however, actual costs incurred for these programs will

likely exceed this amount.  The monitor has made a number of recommendations related to our compliance programs.

….

We are in the process of making certain changes to our compliance program for transactions from the United States to Mexico, including:

- revisions to agent agreements to increase our ability to oversee the compliance of our agents and subagents;

- reduced thresholds at which our consumers are required to provide identification for transactions from certain states along the United States southwest border; and

- enhancement of our information systems including migrating customer information for our Western Union, Orlandi Valuta and Vigo brands onto a common database and migrating to a standard point of sale system.

Such changes will likely have an adverse effect on our United States to Mexico business.  Any additional changes that we elect or are required to make in the United States to Mexico corridor, or similar changes that we may elect or be required to make in other corridors, could have a material adverse effect on our business, financial condition or results of operations.

127.    Thereafter, on or about October 30, 2012, one or more of the Individual Defendants caused the Company to publish a press release announcing the Company's earnings for Q3 2012.   Regarding the Company's C2C revenue and transactions for the quarter, the press release reported a "revenue decrease of 4% on a reported basis and a decrease of 1% constant currency, with transactions at the same level as the prior year period.  C2C constant currency revenue increased slightly for the Western Union brand, while the Vigo and Orlandi Valuta brands declined as a result of the compliance changes related to the Southwest Border Agreement." Similarly, regarding the North America region in particular, the press release reported a

"North America region revenue decrease of 8% from the prior year period, primarily due to the impact of compliance related actions affecting the Vigo and Orlandi Valuta brands serving the U.S. to Mexico and various Latin American countries." Further, the July 24, 2012 press release quoted Ersek as follows:

> "In the third quarter our revenues increased 1%. Business was challenging, as soft global economic conditions, compliance related changes, and competitive pressures in certain money transfer corridors impacted revenues. Globally, Western Union branded consumer money transfer revenue grew slightly in constant currency terms, with our on-line business once again delivering very good results. We continue to generate strong cash flow, and year-to-date we have now returned over $600 million to shareholders through share repurchase and dividends."

> Ersek continued, "We are continuing to advance our growth strategies: expanding our network in consumer money transfer; adding on-line and other digital capabilities to attract new consumers; acquiring business customers and expanding geographies in our business-to-business segment; and establishing a global presence in stored value. As we have progressed through 2012, however, the market environment in consumer money transfer has become more difficult, especially in recent months. To better position us for the sustainable growth of this business we are implementing a series of strategic actions, with a focus on enhancing our value proposition, continuing to invest in the fast growing digital channels, and further optimizing our cost structure."

> Ersek added, "Enhancing our value proposition will include improving the customer experience and accelerating pricing investment in certain corridors. Although these investments will negatively impact short-term financial results, we believe they are the right actions to regain market share momentum and drive long-term revenue and profit growth. Similar initiatives have delivered solid results in the past, such as with our U.S. domestic money transfer repositioning in late 2009."

> Ersek added, "We remain very confident about the long-term prospects for the business. We are a leader in a growing market in consumer money transfer, and we are taking steps to enhance our position for the future. We will continue to execute our strategies in business-to-business, digital, and stored value. I am also pleased to announce our board of directors has approved a 25% increase in

our dividend, to $0.50 per share annually, as well as a new $550 million share repurchase authorization, which gives us the opportunity to repurchase up to approximately $750 million of our shares through the end of 2013."

128.    Regarding the Company's 2012 outlook, one or more of the Individual

Defendants caused the Company to announce in the October 30, 2012 press release:

The Company has updated its full year 2012 revenue, margin, and EPS outlook to reflect lower second half revenue trends. Margins and EPS have also been adjusted to include approximately $30 million of anticipated pre-tax expenses related to new cost savings initiatives.

The Company now expects the following outlook for 2012:

Revenue

- Constant currency revenue growth in the range of +4% to +5%, including a +4% benefit from the full year inclusion of TGBP

- GAAP revenue growth 2% lower than constant currency;
                    ....

Operating Margins

- The current outlook for margins includes an approximately 0.5% negative impact from expenses related to the new costs savings initiatives

- GAAP operating margin of approximately 23.5%. The Company's previous outlook for GAAP operating margin was approximately 24.5%

- Operating margin of approximately 24.5% excluding TGBP integration costs. The Company's previous outlook was approximately 25.5%

- EBITDA margin excluding TGBP integration costs of approximately 29% The Company's previous outlook was approximately 30%
                    ....

Earnings Per Share

- The current outlook for EPS includes $0.04 of expenses related to the new cost savings initiatives

- GAAP EPS in the range of $1.60 to $1.63, which compares to the previous outlook of $1.68 to $1.72

- EPS excluding TGBP integration expenses in a range of $1.65 to $1.68, which compares to the previous outlook of $1.73 to $1.77.

129.   After the Company released the October 30, 2012 press release, Western Union's stock plummeted 29%, or $5.20 per share, on heavy trading volume, to close at a Relevant Period low (and then-three-year low) of $12.73 per share on October 31, 2012.

130.   Thereafter, on or about November 6, 2012, one or more of the Individual Defendants caused the Company to file with the SEC the Company's Form 10-Q Quarterly Report for Q3 2012.  The Form 10-Q included signed certifications by Ersek and Scheirman, which were identical, or substantially and materially identical, to the certifications set forth in paragraph 51 above.

131.   Regarding the Company's North America business for the quarter, one or more of the Individual Defendants caused the Company to report in the November 6, 2012 Form 10-Q:

> The North America region represented 20% and 21% of our total consolidated revenue for the three and nine months ended September 30, 2012, respectively. For the three and nine months ended September 30, 2012, the North America region experienced revenue declines of 8% and 1%, respectively, on a transaction decline of 5% and an increase of 1%, respectively. For both the three and nine months ended September 30, 2012, revenues were negatively impacted by geographic and product mix. Our Mexico business declined for the three and nine months ended September 30, 2012, primarily due to changes to our compliance

related practices as a result of our agreement and settlement with the State of Arizona and business model. These changes, primarily related to our Vigo® and Orlandi Valuta$^{SM}$ brands, have resulted in the loss of over 7,000 agent locations in Mexico. For the three months ended September 30, 2012, our domestic business (transactions between and within the United States and Canada) experienced flat revenue while transactions grew, primarily in lower principal bands which generate lower revenues per transaction. Our United States outbound business experienced revenue and transaction declines, in part due to changes in our compliance related practices as a result of our agreement and settlement with the State of Arizona and business model for our Vigo brand. For the nine months ended September 30, 2012, we experienced revenue and transaction growth in our domestic and United States outbound businesses.

132.    Further, regarding "Litigation and Related Contingencies," one or more of

the Individual Defendants caused the Company to state in the November 6, 2012 Form

10-Q (in relevant part):

On February 11, 2010, the Company signed an agreement and settlement, which resolved all outstanding legal issues and claims with the State of Arizona and required the Company to fund a multi-state not-for-profit organization promoting safety and security along the United States and Mexico border, in which California, Texas and New Mexico are participating with Arizona. The accrual included amounts for reimbursement to the State of Arizona for its costs associated with this matter. In addition, as part of the agreement and settlement, the Company has made and expects to make certain investments in its compliance programs along the United States and Mexico border and a monitor has been engaged for those programs. The costs of the investments in the Company's programs and for the monitor are expected to be $23.0 million over the period from signing to 2013, pursuant to the terms of the agreement and settlement; however, actual costs incurred for these programs will likely exceed this amount. If the Company is unable to satisfy the material obligations under the agreement and settlement, the State of Arizona could declare the Company in breach and could initiate civil or criminal actions which could have a material adverse effect on our business, financial condition or results of operations.

133.   Further, in the "Recent Developments" section of the November 6, 2012 Form 10-Q's "Management discussion and analysis of financial condition and results of operations," one or more of the Individual Defendants caused the Company to report (in relevant part):

> Soft global economic conditions, compliance related changes and competitive pressures, including significant pricing pressures between our money transfer services and those of some of our competitors in certain key money transfer corridors, adversely impacted revenue in our Consumer-to-Consumer segment during the three months ended September 30, 2012 and we expect such trends to continue in 2013. As further described below, we are taking actions to address these recent trends focusing on improving our customer value proposition by implementing strategic fee reductions and improving our customer experience, growing our investments in our information technology (IT) and other areas to support new channel and new product development and innovation, and implementing productivity and cost savings initiatives….

134.   The news only worsened during 2013, as the full extent and gravity of the false and misleading statements the Individual Defendants caused the Company to make during the Relevant Period were revealed.  In February 2013, for example, the Individual Defendants caused the Company to disclose for the first time that Western Union had in fact spent over $40 million on compliance activities under the Arizona Settlement Agreement from the time it signed the agreement through the time it reported its Q4 2012 and FY 2012 earnings in February 2013, and also that Western Union's business solutions segment had been added to the scope of the monitor's scrutiny under the Arizona Settlement Agreement.

135.   Further, in the Company's February 22, 2013 Form 10-K for FY 2012, the Individual Defendants caused the Company to disclose for the first time that the Company did not expect to meet all of its compliance obligations under the Arizona

Settlement Agreement within the timeframe required by the agreement, which posed the risk of further, serious repercussions to the Company:

> We are considering entering into an extension of the term of the agreement and settlement or another arrangement with the State of Arizona, either of which would require the approval of the State of Arizona and could have further adverse effects on our business, including additional costs. The monitor has made a number of recommendations regarding our compliance programs. While the Company has devoted significant time and resources to these efforts, it is expected that not every recommendation of the monitor will be fully implemented within the required timeframe ending on July 31, 2013. If the Company is not able to negotiate an extension of the agreement and settlement or other arrangement and the State of Arizona determines that the Company has committed a willful and material breach, the State of Arizona has indicated that it will pursue remedies under the agreement and settlement, which could include initiating civil or criminal actions. The pursuit by the State of Arizona of remedies under the agreement and settlement could have a material adverse effect on our business, financial condition or results of operations….

136.   Further, the Individual Defendants caused the Company to disclose in the February 22, 2013 Form 10-K, the monitor may continue to make further recommendations that may cause the Company to further modify its C2C business operations, and warned that "any additional changes that we elect or are required to make in the United States to Mexico and the United States to Latin America and the Caribbean corridors, or similar changes that we may elect or be required to make in other corridors or for our other services, could have a material adverse effect on our business, financial condition or results of operations."

137.   Further, throughout 2013, the Company formally requested, and was given, multiple extensions to attempt to meet its compliance obligations under the Arizona Settlement Agreement, including most recently an extension of until January 31, 2014, which was approved by an Arizona court on December 19, 2013.

138.    Finally, on or about November 15, 2013, the Company announced that Scheirman had resigned, effective December 31, 2013.    Thereafter, on or about November 18, 2013, Moody's Investors Service announced that, following a review of Western Union's operating profile and prospects, Moody's had downgraded Western Union's senior unsecured rating to Baa2 from Baa1, in substantial part because of: (i) Western Union's large (and increasingly higher) compliance costs, and (ii) because Western Union had presented a constraining outlook for its 2014 operating profit, stating that it did not expect any operating profit growth in 2014 because of increased compliance costs.

## THE FRAUDULENT STOCK REPURCHASES

139.    While the Individual Defendants were making false or materially misleading and improper statements that artificially inflated the Company's stock price, the Director Defendants directed or permitted the Company to overpay for its own stock through significant stock repurchases.  The Director Defendants facilitated and allowed the Company to repurchase its shares at inflated prices by authorizing stock buy-back programs during the Relevant Period allowing the Company to repurchase over $1.5 billion in stock over the Relevant Period.  The Director Defendants knew or recklessly disregarded the fact that the Company's stock price was artificially inflated due to the false or materially misleading statements alleged herein, and they failed to prevent the Company from repurchasing its stock at inflated prices.   Ersek and Scheirman, as Western Union's top executives, were ultimately responsible for the Company's repurchases.  Despite knowing that the Company's stock was inflated due to their own

and others' improper and misleading statements, Ersek and Scheirman collectively directed or permitted the repurchase of over $1.557 billion of the Company's stock.

140.   In particular, pursuant to stock repurchase programs authorized by the Director Defendants, the Board permitted the Company to repurchase 85,092,040 shares at a cost of $1.557 billion from May 1, 2010 through September 30, 2012.  The Director Defendants caused the Company to make these repurchases well after the Arizona Settlement Agreement was executed, and continuing up until the time that the Individual Defendants caused the Company to announce its Q3 2012 earnings on October 30, 2012, causing a 29% decline in the value of the Company's stock.

141.   The Director Defendants knew, or recklessly disregarded that the Company's share price was inflated due to the false or materially misleading statements described herein regarding the nature and sustainability of the positive trends, revenue and, revenue growth for the Company's C2C business involving Mexico and Latin America, the Company's purported compliance with applicable laws, and the purported comprehensiveness and effectiveness of the Company's AML/regulatory expertise, internal controls, and compliance protocols.   Nevertheless, the Director Defendants allowed the Company to deplete its assets by paying large premiums to repurchase its own stock, despite knowing (or recklessly disregarding) that the exposure of these false or materially misleading statements would cause the Company's stock price to drop significantly.

142.   Specifically, under the Director Defendants' direction, the Company bought back its shares at an average price of $18.30 per share, substantially higher than Western Union's closing price of $12.73 per share on October 31, 2012, after the

Individual Defendants caused the Company to announce its Q3 2012 earnings.   The Company thus incurred real economic loss from the shares it repurchased at inflated prices during the Relevant Period.

### INSIDER TRADING

143.   During the Relevant Period, Scheirman unloaded hundreds of thousands of shares of his Western Union stock on the market through two highly unusual sales, at average prices ranging from $17.88 per share to as high as $21.68 per share (near the highest trading price for Western Union stock during the Relevant Period).   Collectively, Scheirman's sales netted him proceeds of over $8.3 million.

144.   Scheirman, as the CFO of Western Union throughout the Relevant Period, had direct, daily access to the materially adverse information described above but hidden from shareholders regarding the nature and sustainability of the positive trends, revenues, and revenue growth for the Company's C2C business involving Mexico and Latin America.

145.   While in possession of this nonpublic information, Scheirman sold 389,258 shares of Western Union stock at average prices ranging from $17.88 to $21.68 per share, for a net total of $8,336,706.   These stock sales were suspicious and highly unusual for a number of reasons:

> i.   Timing:   Scheirman's largest sale – of 362,341 shares at an average price of $21.68 per share, at a price near the Relevant Period high and for proceeds of $7,855,553, was made on March 1, 2012, just days after the Individual Defendants (including Scheirman, himself) caused the Company to file and publish its

February 25, 2011 Form 10-K containing the false and materially misleading statements alleged herein.   Similarly, Scheirman's second sale – of 26,917 shares at an average price of $17.88 per share for proceeds of $481,153 – was made between February 17, 2012 and February 21, 2012, while one or more of the Individual Defendants (including Scheirman) were continuing to cause the Company to paint a false and misleading picture concerning the nature and sustainability of the positive trends, revenues, and revenue growth for the Company's C2C business involving Mexico and Latin America, and only days before one or more of the Individual Defendants (including Scheirman) caused the Company to file and publish its February 24, 2012 Form 10-K, wherein the truth regarding the false and misleading statements alleged herein began to be revealed.

ii.  <u>Amount</u>:  Scheirman's March 1, 2011 sale amounted to a sale of 82.6% of his total common stock holdings in Western Union, and by the time of his final trade, Scheirman had sold 86% of his total common stock holdings in Western Union.

iii.  <u>Prior Trading History</u>:   Before the above-described sales, Scheirman had only one other, small sale on September 29, 2009, which occurred several months before the Relevant Period. Scheirman has not made any further sales during the nearly two years that have passed since Scheirman's February 2012 sales.

And, while Scheirman's sales during the Relevant Period were purportedly made pursuant to a 10b5-1 trading plan, that plan was not enacted until August 25, 2010 -- well after the Relevant Period (and the scheme to artificially inflate Western Union's stock price) began.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### *Fiduciary Duties*

146. By reason of their positions as officers, directors, and/or fiduciaries of Western Union and because of their ability to control the business and corporate affairs of Western Union, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Western Union in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of Western Union and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

147. Each director and officer of the Company owes to Western Union and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.   In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

### *Audit Committee Duties*

148.   In addition to these duties, the members of the Audit Committee owed specific duties to Western Union under the Audit Committee's Charter to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.   In particular, the Audit Committee's Charter provides (in relevant part) as follows:

> B. With respect to financial reporting, the Committee shall:
>
> 1. Meet to review and discuss with management, independent auditors and internal auditors the annual audited financial statements and quarterly financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."
>
> 2. Discuss with the independent auditors the matters required to be discussed by standards established by the Public Company Accounting Oversight Board (United States) and the rules of the New York Stock Exchange, as modified or supplemented.
>
> 3. Discuss with the independent auditors (i) any significant matters arising from any audit, (ii) any difficulties encountered by the independent auditors in the course of the audit, (iii) any restrictions on their activities or access to requested information, (iv) any significant disagreements with management, and (v) management's response to each.
>
> 4. Review and discuss with the independent auditors their report of audit, the accompanying management letter, if any, and management's responses thereto.
>
> 5. Review any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles.
>
> 6. Review any major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies.

7. Review analyses prepared by management or independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.

8. Review the critical accounting policies and practices of the Company.

9. Review the effect of regulatory and accounting initiatives, as well as off balance sheet structures, on the financial statements of the Company.

10. Discuss with the independent auditors their judgments about the quality, appropriateness and acceptability of the Company's accounting principles and financial disclosure practices, as well as the completeness and accuracy of the Company's financial statements.

11. Recommend to the Company's Board of Directors whether the audited financial statements should be included in the Company's Annual Report on Form 10-K to be filed with the Securities and Exchange Commission.

12. Prepare any report or other disclosures required by the rules of the Securities and Exchange Commission to be included in the Company's annual proxy statement and any other Committee report required by applicable securities laws or stock exchange requirements.

13. Review and discuss, in conjunction with the management, the Company's policies generally with respect to its earnings press releases and with respect to financial information and earnings guidance provided to analysts and rating agencies, including in each case the types of financial information to be disclosed and presentations to be made.

14. Review the Company's guidelines and policies that govern the process by which the Company goes about assessing and managing its exposure to risks, including discussing with management, internal auditors and the independent auditor their assessment of the Company's major financial risk exposures and the steps that have been taken to monitor and control such exposures.

15. In connection with its oversight responsibilities, the Committee shall be directly responsible for the resolution of disagreements between management and any auditor regarding the Company's financial reporting.

149.   Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

### *Corporate Governance and Public Policy Committee Duties*

150.   In addition to their aforementioned duties as directors, the members of the Corporate Governance and Public Policy Committee owed specific duties to Western Union under the Corporate Governance and Public Policy Committee Charter.   In particular, the Corporate Governance and Public Policy Committee's Charter states (in relevant part) that "the purpose of the Corporate Governance and Public Policy Committee of the Board of Directors of The Western Union Company is to … (iii) develop and recommend to the Board corporate governance guidelines for the Company, (iv) oversee the evaluation of the Board and its committees, and (v) review and advise the Board regarding matters of public policy and social responsibility as they relate to the Company."

151.   Further, in more specifically delineating the duties of the Corporate Governance and Public Policy Committee members, the charter mandates (among other duties) that the committee members shall:

- Recommend to the Board of Directors corporate governance guidelines addressing, among other matters, the size, composition and responsibilities of the Board of Directors and its committees, including its oversight of management and consultations with management. The corporate governance guidelines shall be

reviewed not less frequently than annually by the Committee, and the Committee shall make recommendations to the Board of Directors with respect to changes to the guidelines;

- Advise the Board of Directors with respect to the charters, structure and operations of the various committees of the Board of Directors and qualifications for membership thereon, including policies for removal of members and rotation of members among other committees of the Board of Directors; and

- Review and advise the Board of Directors regarding matters of public policy and social responsibility which are relevant to the Company or the industries in which the Company operates, including without limitation trends, policies and regulatory developments relating to immigration and charitable giving activities.

152. Upon information and belief, the Company maintained a Corporate Governance and Public Policy Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Corporate Governance and Public Policy Committee as those set forth above.

### Control, Access, and Authority

153. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Western Union, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Western Union.

154. Because of their advisory, executive, managerial, and/or directorial positions with Western Union, each of the Individual Defendants had access to adverse,

non-public information about the financial condition, operations, and improper representations of Western Union.

155.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Western Union, and was at all times acting within the course and scope of such agency.

### Reasonable and Prudent Supervision

156.    To discharge their duties, the officers and directors of Western Union were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Western Union were required to, among other things:

(a)    refrain from acting upon material inside corporate information to benefit themselves;

(b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(e)    remain informed as to how Western Union conducted its

operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)     ensure that Western Union was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

157.   Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Western Union and to its shareholders the fiduciary duties of loyalty and good faith and the exercise of due care and diligence in the management and administration of Western Union's affairs, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Western Union, the absence of good faith on their part, and a reckless disregard for their duties to Western Union and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Western Union.

158.   The Individual Defendants each breached their duty of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and misleading statements, or by failing to take any actions to correct the false and/or misleading statements.  The false and misleading statements misled shareholders into believing that the Company's positive momentum and revenue growth in its C2C business involving Mexico and Latin America would continue, that the Company was complying with the Arizona Settlement Agreement, and that its costs of implementing measures in compliance with the Arizona Settlement Agreement would

only reach up to $23 million.  In addition, as a result of the Individual Defendants' illegal

actions and course of conduct, the Company is now the subject of the Securities Class

Action that alleges violations of the federal securities laws.  As a result, Western Union

has expended, and will continue to expend, significant sums of money to rectify the

Defendants' wrongdoing.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

159.   In committing the wrongful acts alleged herein, the Individual Defendants

have pursued, or joined in the pursuit of, a common course of conduct, and have acted

in concert with and conspired with one another in furtherance of their wrongdoing.  The

Individual Defendants further aided and abetted and/or assisted each other in breaching

their respective duties.

160.   During all times relevant hereto, the Individual Defendants collectively and

individually initiated a course of conduct that was designed to mislead shareholders into

believing that the Company's trends and revenues in its C2C business involving Mexico

and Latin America were positive and growing, that these positive trends and growth

would continue and were not at risk due to the Company's actual or anticipated burdens

and obligations under the Arizona Settlement Agreement, and that the costs of the

Company's compliance with the Arizona Settlement Agreement would only reach up to

$23 million.   In furtherance of this plan, conspiracy, and course of conduct, the

Individual Defendants collectively and individually took the actions set forth herein.

161.   The purpose and effect of the Individual Defendants' conspiracy, common

enterprise, and/or common course of conduct was, among other things, to: (a) disguise

the Individual Defendants' violations of law, including breaches of fiduciary duties,

unjust enrichment, and waste of corporate assets; and (b) disguise and misrepresent the Company's future business prospects.

162.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

163.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO WESTERN UNION

164.   As a result of the Individual Defendants' wrongful conduct, Western Union disseminated false and misleading statements.   The improper statements have devastated Western Union's credibility.   Additionally, Western Union is now the subject of the Securities Class Action.  The Company will face substantial costs in connection with an investigation and the Securities Class Action.

165.   As a direct and proximate result of the Individual Defendants' actions as alleged above, Western Union's market capitalization has been substantially damaged.

166.   Further, as a direct and proximate result of the Individual Defendants' conduct, Western Union has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)   costs incurred in investigating and defending Western Union and certain officers in the Securities Class Action, plus potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment;

(b)   costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on Western Union's artificially-inflated stock price and inflated revenues;

(c)   increased borrowing costs and expenses associated with the Company's credit rating being downgraded as a result of the Individual Defendants' misconduct;

(d)   costs incurred from the Company buying back $1.557 billion worth of shares of Company stock at prices inflated through the Individual Defendants' misconduct;

(e)   costs incurred from the misappropriation of Company information by Scheirman for the purpose of selling Western Union common stock at artificially inflated prices; and

(f)   costs incurred from the loss of the Company's customers' confidence in Western Union's services.

167.   Moreover, these actions have irreparably damaged Western Union's corporate image and goodwill.  For at least the foreseeable future, Western Union will suffer from what is known as the "liar's discount," a term applied to the stocks of

companies who have been implicated in illegal behavior and have misled the investing public, such that Western Union's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

168.   Plaintiff brings this action derivatively in the right and for the benefit of Western Union to redress injuries suffered, and to be suffered, by Western Union as a direct result of the Individual Defendants' breaches of fiduciary duties, unjust enrichment, and corporate waste, as well as the aiding and abetting thereof, by the Individual Defendants.   Western Union is named as a nominal defendant solely in a derivative capacity.

169.   Plaintiff will adequately and fairly represent the interests of Western Union in enforcing and prosecuting its rights.

170.   Plaintiff was a shareholder of Western Union common stock throughout the entire Relevant Period and has been continuously since.

171.   Plaintiff did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act.

172.   At the time this action was commenced, the Board of Western Union consisted of the following eleven directors: Ersek, Greenberg, Devitre, Goodman, Holden, Levinson, Mendoza, Miles, Schimmelmann, Trujillo, and Frances Fragos Townsend (who joined the Board in August 2013, after the end of the Relevant Period).

***Demand is Futile as to All Director Defendants Because the Director Defendants Face a Substantial Likelihood of Liability***

173.   Director Defendants Ersek, Greenberg, Devitre, Goodman, Holden, Levinson, Mendoza, Miles, Schimmelmann, and Trujillo face a substantial likelihood of

liability for their individual misconduct.    The Director Defendants were directors throughout the Relevant Period (or, regarding Ersek's and Trujillo's case, for a substantial and material portion of the Relevant Period), and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning the nature and sustainability of the Company's positive trends and revenue growth for its C2C business involving Mexico and Latin America and the nature and extent of the Company's compliance efforts (and the risks associated with those compliance efforts) under the Arizona Settlement Agreement, were true and not materially misleading.  Moreover, the Director Defendants, as directors (and, in some cases, also as Audit Committee members and/or Corporate Governance and Public Policy Committee members) owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls and/or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's and Corporate Governance and Public Policy Committee's duties were being discharged in good faith and with the required diligence and due care.   Instead, they knowingly and/or with reckless disregard reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.

174.   Further, The Director Defendants violated the Exchange Act and wasted Western Union's corporate assets by authorizing and effectuating the repurchase of $1.557 billion of the Company's stock at prices they knew, or recklessly were unaware,

were artificially inflated.  Causing or permitting a public company to repurchase its stock at artificially inflated prices was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration as fair or reasonable.  The Director Defendants also wasted corporate assets by paying improper compensation, bonuses, and severance to certain of the Company's executive officers and directors.   The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

175.   The Director Defendants' making or authorization of false and misleading statements throughout the Relevant Period, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Audit Committee's and Corporate Governance and Public Policy Committee's duties were being discharged in good faith and with the required diligence, violation of the Exchange Act, and/or acts of corporate waste constitute breaches of fiduciary duties, for which the Director Defendants face a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of Western Union to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason demand is futile.

### *Demand is Futile as to the Audit Committee Defendants*

176.   Defendants Devitre, Goodman, Levinson, Mendoza, and Miles, as Audit Committee members during the Relevant Period, were responsible for reviewing and approving quarterly and annual financial statements and earnings press releases, for overseeing Western Union's internal controls over financial reporting, and for discharging their other duties described herein.   Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing and preventing the dissemination of false and/or materially misleading earnings press releases and earnings guidance.   Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon the Audit Committee Defendants therefore is futile.

### *Demand is Futile as to the Corporate Governance and Public Policy Committee Defendants*

177.   Despite their aforementioned duties as members of the Corporate Governance and Public Policy Committee, the Corporate Governance and Public Policy Committee Defendants failed to exercise due diligence and reasonable care in discharging their duties because they knew, or with the exercise of any reasonable due diligence reasonably should have known, that the directors and the Audit Committee Defendants were not effectively discharging their duties to ensure or take reasonable and necessary steps to ensure that the Company's statements regarding the nature and sustainability of the positive trends and revenue from its C2C business involving Mexico and Latin America, as well as the Company's statements and disclosures regarding the Company's obligations under and compliance with the Arizona Settlement Agreement,

were not false or materially misleading.  The Corporate Governance and Public Policy Committee Defendants, however, made no effort to correct the problems or take any actions or steps to halt those problems or prevent their reoccurrence.  Accordingly, the Corporate Governance and Public Policy Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon the Corporate Governance and Public Policy Committee Defendants therefore is futile.

### *Demand is Futile as to Defendant Ersek for Additional Reasons*

178.   In addition to the reasons discussed herein as to why demand is futile as to all Director Defendants, demand is futile as to Ersek because Ersek is not an independent director.

179.   Ersek also cannot disinterestedly consider a demand to bring suit against himself because Ersek is a named defendant in at least one related securities fraud class action alleging that he made many of the same misstatements described above in violation of the federal securities laws.  Thus, if Ersek were to initiate suit in this action he would compromise his ability to simultaneously defend himself in the related securities action and would expose himself to liability in this action.  This he will not do.

180.   Demand is futile for the additional reason that Ersek is an employee of the Company who derives substantially all of his income from his employment with Western Union.  As such, he cannot independently consider any demand to sue himself for breaching his fiduciary duties to Western Union, because that would expose him to liability and threaten his livelihood.

***Demand is Futile as to All Director Defendants for Additional Reasons***

181.   If Western Union's current officers and directors are protected against personal liability for their acts of mismanagement and breaches of fiduciary duties alleged in this complaint by directors and officers liability insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders.  However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Western Union against the Individual Defendants, known as the "insured versus insured exclusion."  As a result, if the Director Defendants were to sue themselves or certain of the officers of Western Union, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

182.   Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting Western Union by prosecuting this action.  Therefore, demand on Western Union and its Board is futile and is excused.

183.   Western Union has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants

have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

### COUNT I
***Against Defendants Ersek and Scheirman for Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder***

184.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

185.   Ersek and Scheirman made and caused the publication of false or materially misleading statements regarding: (a) the nature and sustainability of the positive trends, revenue, and revenue growth for the Company's C2C business involving Mexico and Latin America; (b) the purported comprehensiveness and effectiveness of the Company's internal controls and global AML/regulatory capabilities; (c) the true nature, scope, and extent of the Company's actual or likely burdens and obligations under the Arizona Settlement Agreement; and (d) the true nature, scope, and extent of the risks or likely risks to the Company's C2C business involving Mexico and Latin America stemming from the Company's burdens and obligations under the Arizona Settlement Agreement.  Ersek and Scheirman knew or recklessly disregarded the fact that the foregoing statements were false or materially misleading.

186.   Ersek and Scheirman knowingly, willfully, and acting with scienter permitted and facilitated Western Union's repurchase of 85,092,040 shares of its own stock at a cost to the Company of $1.557 billion, when they knew that Western Union's stock was substantially artificially inflated due to the false or misleading statements

alleged herein.   The repurchases of Western Union stock were intended to and did manipulate or deceive Western Union and its shareholders.

187.   The wrongful conduct alleged herein was continuous, connected, and ongoing.  Ersek's and Scheirman's misconduct resulted in continuous, connected, and ongoing harm to the Company.

188.   Ersek and Scheirman violated section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they:

(a)   employed devices, schemes, and artifices to defraud;

(b)   made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Western Union stock.

189.   Western Union has suffered damages by repurchasing the Company's stock at prices that Ersek and Scheirman knew were artificially inflated as a result of the false and or materially misleading statements.   But for Ersek's and Scheirman's misconduct, the Company would not have purchased its stock at the prices it paid, or at all, if it had been aware that the market prices had been artificially and falsely inflated by the misleading statements.

## COUNT II
### *Against the Director Defendants for Violation of Section 20(a) of the Exchange Act*

190.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

191.   The wrongful conduct alleged herein was continuous, connected, and ongoing during the Relevant Period, from the beginning of the Relevant Period through October 30, 2012, when the full truth was revealed.   The Director Defendants' misconduct resulted in continuous, connected, and ongoing harm to the Company.

192.   The Director Defendants exercised actual power and control over the Company's general affairs, including the content of public statements disseminated by Western Union and the timing and amount of stock repurchases, and exercised their actual power and authority to control or influence one another and Ersek and Scheirman in connection with the specific conduct that violated section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder as alleged above.

193.   The Audit Committee Defendants, as directors and members of the Audit Committee during the Relevant Period, exercised actual power and control over the Company's general affairs, including the content of public statements disseminated by Western Union and the timing and amount of stock repurchases, and exercised their actual power and control over Ersek, as the Company's CEO, and Scheirman, as the Company's CFO, in connection with the specific corporate policies and conduct that violated section 10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

194.   Each of the Individual Defendants is jointly and severally liable under section 20(a) of the Exchange Act to the same extent as Ersek and Scheirman for the primary violation of section 10(b) and Rule 10b-5 promulgated thereunder, as set forth herein.   The Director Defendants did not act in good faith.

**COUNT III**
*Against the Individual Defendants for Breach of Fiduciary Duties*

195.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

196.   The Individual Defendants owed and owe Western Union fiduciary obligations.   By reason of their fiduciary relationships, Defendants owed and owe Western Union the highest obligations of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

197.   The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

198.   The Individual Defendants each knowingly, recklessly or negligently: (i) made false or misleading statements that misrepresented or failed to disclose material information concerning the Company, (ii) approved the issuance of such false and/or misleading statements, and/or (iii) failed to take actions to correct such false and/or misleading statements after they had been disseminated by the Company.   These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

199.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Western Union has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

200.   Plaintiff, on behalf of Western Union, has no adequate remedy at law.

**COUNT IV**
***Against the Individual Defendants for Unjust Enrichment***

201.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

202.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Western Union.

203.   The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Western Union.

204.   Plaintiff, as a shareholder and representative of Western Union, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

205.   Plaintiff, on behalf of Western Union, has no adequate remedy at law.

**COUNT V**
***Against the Director Defendants for Waste of Corporate Assets***

206.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

207.   As detailed above, the Director Defendants diverted corporate assets for improper and unnecessary purposes.  Any benefits received by the Company cannot reasonably be viewed as a fair exchange for the corporate assets and monies expended by Western Union.

208.   The Director Defendants wasted Western Union's corporate assets by authorizing and effectuating the repurchase of $1.557 billion of the Company's stock at prices they knew, or recklessly were unaware, were artificially inflated.  Causing or

permitting a public company to repurchase its stock at artificially inflated prices was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration as fair or reasonable.

209.    The Director Defendants also wasted corporate assets by paying improper compensation, bonuses, and severance to certain of the Company's executive officers and directors, breaching their fiduciary duties, exposing Western Union to civil liability, and causing the Company to incur potentially millions of dollars in legal costs.   The handsome remunerations paid to wayward fiduciaries who proceeded to breach their fiduciary duties to the Company was improper and unnecessary, and no person of ordinary, sound business judgment would view this exchange of consideration for services rendered as fair or reasonable.

210.    As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

211.    Plaintiff, on behalf of Western Union, has no adequate remedy at law.

**Count VI**
***Against Defendant Scheirman for Misappropriation of Information and Insider Trading***

212.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

213.    At the time Scheirman sold his Western Union common stock he was an officer of Western Union, which relationship gave him access, directly or indirectly, to material information about the Company not generally available to the public.

214.    Scheirman sold Western Union securities at a time or times when he knew material information about Western Union – gained from his relationship with the

Company – which would have significantly affected the price of Western Union common stock and was not generally available to the public.

215.   Scheirman knew these facts were not intended to be available to the public.   Had such information been generally available to the public, it would have significantly reduced the market price of Western Union common stock.

216.   Scheirman had knowledge of material, adverse, non-public information about Western Union, misappropriated this information for his own use, and sold his Western Union common stock on the basis of this information at artificially inflated prices in violation of his fiduciary duties.

217.   Plaintiff, as a shareholder and representative of Western Union, seeks restitution from Scheirman and seeks an order from the Court disgorging all profits and other benefits derived from his wrongful conduct and fiduciary breaches.

218.   Plaintiff, on behalf of Western Union, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Against all the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, aiding and abetting breaches of fiduciary duties, unjust enrichment, violation of the Exchange Act, corporate waste, and/or insider trading;

B.   Directing Western Union to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Western Union and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation

and taking such other action as may be necessary to place before shareholders for a

vote the following Corporate Governance Policies:

- a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a provision to permit the shareholders of Western Union to nominate at least two candidates for election to the Board;

- a proposal to ensure the accuracy of the qualifications of Western Union's directors, executives and other employees;

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls, and auditing matters;

- a provision to implement insider trading controls or strengthen Western Union's insider trading controls; and

- a provision to appropriately test and then strengthen the internal audit and control functions;

C.     Awarding to Western Union restitution from the Individual Defendants, and

each of them, and ordering disgorgement of all profits, benefits, and other

compensation obtained by the Individual Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including

reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

//

//

**JURY DEMAND**

Plaintiff demands a trial by jury.


Dated: January 19, 2014                 JOHNSON & WEAVER, LLP
                                        FRANK J. JOHNSON
                                        SHAWN E. FIELDS

                                         */s Frank J. Johnson*
                                        FRANK J. JOHNSON

                                        110 West "A" Street, Suite 750
                                        San Diego, CA 92101
                                        Telephone: (619) 230-0063
                                        Facsimile: (619) 255-1856
                                        E-mail: frankj@johnsonandweaver.com
                                        E-mail: shawnf@johnsonandweaver.com

                                        *Attorneys for Plaintiff Stanley Lieblein*

## VERIFICATION

I, Stanley Lieblein, hereby verify that I am a shareholder of The Western Union Company (the "Company"), and am ready, willing, and able to pursue this action in the hope of improving the Company and recovering damages for the Company caused by the defendants' conduct.   I have reviewed the allegations made in this Verified Shareholder Derivative Complaint and to those allegations of which I have personal knowledge I believe those allegations to be true.   As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.   Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

Date: _1/14/14_

_Stanley Lieblein_

Stanley Lieblein