**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger**

Civil Action No. 14-cv-00144-MSK-KLM

**STANLEY LIEBLEIN, Derivatively on Behalf of The Western Union Company,
CITY OF CAMBRIDGE RETIREMENT SYSTEM, and
MARTA/ATU LOCAL 732 EMPLOYEES RETIREMENT PLAN,**

      **Plaintiffs,**

**v.**

**HIKMET ERSEK;
SCOTT T. SCHEIRMAN;
JACK M. GREENBERG;
DINYAR S. DEVITRE;
RICHARD A. GOODMAN;
BETSY D. HOLDEN;
LINDA FAYNE LEVINSON;
ROBERTO G. MENDOZA;
SOLOMON D. TRUJILLO, and
FRANCES M. FRAGOS TOWNSEND**

      **Defendants,**

**-and-**

**THE WESTERN UNION COMPANY, a Delaware corporation,**

      **Nominal Defendant**

_____

**OPINION AND ORDER GRANTING MOTION TO DISMISS**
_____

      **THIS MATTER** comes before the Court pursuant to Defendant Scott Scheirman's

Motion to Dismiss (**# 56**), the Plaintiffs' response (**# 69**), and Mr. Schierman's reply (**# 80**)

Defendants' collective Motion to Dismiss (**# 57, 58**), the Plaintiffs' response (**# 70**), and the

Defendants' collective reply (**# 79**).[1]   The Magistrate Judge[2] heard oral argument on these motions on February 24, 2016 (**# 95**), and the Court has considered the transcript (**# 96**) from that hearing as well.

## FACTS

This is a shareholder derivative suit, brought by shareholders of Nominal Defendant Western Union Company ("WU"), against certain WU directors and officers.  The Consolidated Shareholder Derivative Complaint ("Complaint") (**# 38**) is lengthy and complex, so the Court offers only a greatly summarized version here and elaborates in more detail in its analysis.

WU's primary business operations involve facilitating domestic and international money transfers, by which a customer may send money to a recipient nearly anywhere in the world, usually within a matter of minutes. WU provides this service through a broad network of domestic and international "agents," individuals and entities such as banks, grocery stores, pharmacies, and so on, that serve as WU's storefronts where customers can send or receive funds.  WU charges fees to the senders of money transfers,  which accounted for more than 80% of WU's revenue during the time period at issue here.  Transfers from senders in the United States amounted to approximately 20% of WU's revenues.

The money transfer industry is a common means by which persons engaged in serious criminal activity attempt to launder money.  As a consequence, the money transfer industry is heavily-regulated, both domestically and internationally.  Among other things, transactions

---

[1]      The parties have also filed certain supplemental material (**# 77, 81, 84, 92, 93, 94**) with regard to these motions.

[2]      The Court previously referred these motions to the Magistrate Judge for a Recommendation.  After consultation with the Magistrate Judge and with her consent, the Court withdraws that reference, with the Court's thanks for the Magistrate Judge's assistance in shaping up the matter for resolution.

above a certain dollar threshold trigger requirements that WU obtain and retain identification information for senders and recipients and require WU to disclose high-value transactions to regulatory authorities. Customers (both licit and illicit) sometimes attempt to avoid triggering these regulatory requirements by "structuring" a large transaction as several smaller transactions, each falling below the necessary dollar threshold.  WU allegedly has a reputation for lax compliance with anti-money laundering regulations.  Customers were aware of this fact, and those seeking to avoid or evade scrutiny of their transfers were more likely to use WU than its competitors.  That allowed WU to charge premium rates to such customers.  As a result, WU has enjoyed an unusually large profit margin relative to its competitors and its market share.

After 2002, WU was the subject of frequent investigations and regulatory actions by state and federal authorities who sought to enforce WU's compliance with anti-money laundering rules and policies.  The Complaint goes into considerable detail about several of these investigations, but it is not necessary here to recite the particulars.  It is sufficient to note that WU resolved many of the investigations by paying many millions of dollars in settlement and adopting more stringent anti-money laundering policies.  As pertinent here, such policies often required WU to appoint an officer to oversee WU's compliance with money laundering regulations and that such officer report  to the Board of Directors about compliance issues as well as threatened or actual regulatory actions investigations.

For purposes of this action, the most prominent of the regulatory actions was brought by the State of Arizona in 2005.  The investigation revealed that WU and its agents were not maintaining proper records and indeed, that some of WU's agents in the  Southwest border region of the United States – an area accounting for 25% of WU's domestic revenues – knowingly facilitating money laundering of funds  paid over to human smugglers.  In 2010, WU

and the State of Arizona entered into a settlement agreement – the "Southwest Border Agreement" or "SBA" – intended to resolve the matter.  Among its provisions, the Southwest Border Agreement required WU to allow a court-appointed Monitor to evaluate and recommend improvements to the company's anti-money laundering procedures.  The crux of the Plaintiffs' contentions in this action seems to be that, notwithstanding  the SBA , WU has resisted adoption of the anti-money laundering policies recommended by the Monitor, has attempted to narrow the scope of the Monitor's authority, and  has generally resisted demands that it improve its (and its agents') compliance with regulatory requirements.

Most recently, the State of Arizona asserted that WU was in material breach of the SBA in various respects.  The parties  resolved that dispute by WU's agreement to extend the Monitor's oversight for several more years and to engage in even more aggressive recordkeeping and reporting on transactions over $500 in the Southwest U.S.  The Plaintiffs contend that the additional expenses and reporting requirements resulting from this controversy "could have been avoided if Defendants had ensured good faith compliance" with governmental entities dating back as early as 2003.

The Plaintiffs allege, generally, that each  named director and officer ached his/her fiduciary duties to WU by: (i) willfully failing to address issues of WU's lax anti-money laundering compliance at an earlier date; (ii) allowing misleading proxy statements to be sent to shareholders (in that the proxy statements failed to reveal various facts about the regulatory enforcement actions and investigations that were occurring), (iii) misrepresenting the progress and costs of the SBA in WU's 2010-2012 public securities filings, and (iv) authorizing a stock buy-back program during 2010-2012, when WU stock was trading at an inflated value due to the non-disclosures discussed above.  In addition, the Plaintiffs allege that Mr. Scheirman engaged in

insider trading by disposing of large numbers of WU shares in 2011 and 2012, mindful of these same facts.

Based on these allegations, the Plaintiffs assert six causes of action: (i) breach of fiduciary duty, under an unspecified jurisdiction's common law, against the "Director Defendants" (Defendants Devitre, Ersek, Goodman, Greenberg, Holden, Levinson, Mendoza, Townsend, and Trujillo), based on allegations that, among other things, these Defendants refused to implement an effective anti-money laundering program over many years, reappointed the same Directors to various committees over various years, caused WU to breach the SBA and repurchase artificially-inflated stock, and awarded themselves excessive compensation; (ii) breach of fiduciary duty, under an unspecified jurisdiction's common law, against the "Officer Defendants" (Defendants Ersek, Scheirman, and Stockdale), in that these Defendants caused WU to ignore its anti-money laundering compliance obligations and breach the SBA; (iii) violation of 15 U.S.C. § 78n(a) against all Defendants, in that the Defendants caused WU to issue misleading proxy statements in 2012, 2013, and 2014; (iv) a claim for "corporate waste," under an unspecified jurisdiction's common law, against all Defendants, based on allegations that the Defendants caused WU to pay undeserved compensation to themselves, exposed WU to the expenses of defending against a securities fraud class action, and authorized a stock buy-back program at inflated prices, among other things; (v) unjust enrichment, under an unspecified jurisdiction's common law, against all Defendants; and (vi) breach of fiduciary duty, premised upon insider trading, against Mr. Scheirman.

The Defendants filed a joint Motion to Dismiss (**# 57, 58**), arguing that the Plaintiffs failed to allege sufficient facts to warrant excusing them from having to make a demand on the Board of Directors with regard to any of their claims.  Separately, Mr. Scheirman filed a Motion

to Dismiss **(# 56)**, arguing that: (i) the Plaintiffs do not allege facts showing Mr. Schierman's culpable participation in the events underlying the breach of fiduciary duty claim (Claim 2); (ii) as to Claim 3, the Plaintiffs do not allege facts showing that Mr. Schierman issued or approved the allegedly defective proxy statements; (iii) as to Claim 4, corporate waste,  to the extent it is predicated on the stock repurchase, the Plaintiffs have not pled facts showing that Mr. Schierman was responsible for any false statements that allegedly artificially inflated the stock's price; (iv) as to Claim 4 to the extent  it is predicated on excessive compensation, there is no allegation that Mr. Schierman personally participated in setting the compensation of the Directors or Officers; (v) as to Claim 4 to the extent it  is predicated on Mr. Schierman allegedly exposing WU to a securities fraud lawsuit, the Plaintiffs have not alleged facts sufficient to plead corporate waste in these circumstances; (vi) the unjust enrichment claim fails as a matter of law, based on the failure of the other claims against Mr. Schierman and because the only benefit he allegedly received was duly paid salary and benefits; and (vii) as to Claim 6 – insider trading, the Plaintiffs have failed to adequately allege that Mr. Schierman knew of material, nonpublic information and made trades were based upon such knowledge.

<u>**ANALYSIS**</u>

**A.  Standard of review**

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-plead allegations in the Complaint as true and view those allegations in the light most favorable to the nonmoving party.  *Stidham v. Peace Officer Standards and Training*, 265 F.3d 1144, 1149 (10th Cir. 2001), *quoting Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).  The Court must limit its consideration to the four corners of the Amended Complaint, any documents attached thereto, and any external documents that are

referenced in the Amended Complaint and whose accuracy is not in dispute.  *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002); *Dean Witter Reynolds, Inc. v. Howsam*, 261 F.3d 956, 961 (10th Cir. 2001).

A claim is subject to dismissal if it fails to state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).  To make such an assessment, the Court first discards those averments in the Complaint that are merely legal conclusions or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Id.* at 1949-50.  The Court takes the remaining, well-pled factual contentions, treats them as true, and ascertains whether those facts (coupled, of course, with the law establishing the requisite elements of the claim) support a claim that is "plausible" or whether the claim being asserted is merely "conceivable" or "possible" under the facts alleged.  *Id.* at 1950-51.  What is required to reach the level of "plausibility" varies from context to context, but generally, allegations that are "so general that they encompass a wide swath of conduct, much of it innocent," will not be sufficient.  *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012).

**B.  Demand on Board of Directors**

This action is a derivative one; that is, the Plaintiffs are attempting to bring causes of action that properly belong to WU itself, as the entity ostensibly injured by wrongdoing by its directors and officers.   The decision to commence litigation and assert causes of action belongs in the first instance to the corporation itself.  As a result, most jurisdictions, including Delaware,[3] require that putative shareholder plaintiffs make a pre-suit demand  upon the corporation's board that the corporation pursue the litigation.  *See Kamen v. Kemper Financial Servs., Inc.*, 500 U.S.

---

[3]      The issue of pre-suit demand on the board is governed by the law of the state of the company's incorporation, here, Delaware. *See Kamen*, 500 U.S. at 108-09.

90, 101 (1991); *see also* Fed. R. Civ. P. 23.1(b)(3) (requiring particularized pleading of pre-suit demand or the reasons why it should not be required).   Because such a demand may be futile, as it is often the directors themselves who would be  defendants in the putative suit, some jurisdictions excuse the pre-suit demand  in appropriate circumstances.  *Id.* at 101-02.

It is undisputed that the Plaintiffs  did not make pre-suit demand on WU's Board of Directors.  Thus, the question becomes whether the Complaint alleges sufficient facts to carry the Plaintiffs' burden of showing that such demand would have been futile.  *Beam v. Stewart*, 845 A.2d 1040, 1048-49 (Del. 2004).  The Plaintiffs are required to plead the pertinent facts with particularity.  *Id.*; Fed. R. Civ. P. 23.1(b)(3)(B).

Under Delaware law, two different tests govern the issue of demand futility, depending on the nature of the allegations.  If the suit challenges a particular decision made by the board, the Court applies the *Aronson* test.  *See Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).  The *Aronson* test requires the plaintiff to plead facts sufficient to demonstrate a reasonable doubt  as to whether: (i) the directors were disinterested or independent with regard to the decision in question; or (ii) that the challenged decision was the product of a valid exercise of business judgment.  *Id.*  If the suit does not challenge a specific business decision, but rather, challenges the board's failure to adequately carry out its oversight duties, the Court applies the *Rales* test.  *See Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).  The *Rales* test is essentially the first prong of the *Aronson* test - the  Complaint must plead particularized facts demonstrating that the board could not have made a disinterested and independent decision regarding the demand.[4]  *Id.*

---

[4]     Despite the nominal characterization of *Aronson* and *Rales* as offering distinct analytical frameworks, at least one court has observed that  that they effectively examine the very same questions.  *See Kohls v. Duthie*, 791 A.2d 772, 780-81 (Del. Ch. 2000).

1. _Aronson_ vs. _Rales_

As will be seen below, the Plaintiffs' claims spring entirely from allegations of <u>inaction</u> by WU's Board; the Plaintiffs do not challenge any discrete <u>affirmative</u> action or decision by the Board. The Plaintiffs argue that claims involving inaction are nevertheless governed by the _Aronson_ test. The Plaintiffs prefer this test, as it finds demand on the board to be futile based on a showing that the corporate decision was not protected by the business judgment rule. The Plaintiffs go on to argue that the Defendants' "decisions" essentially condone illegal acts, and thus, cannot possibly be protected by the business judgment rule. The Defendants argue that _Rales_ provides the only appropriate analysis to be used in cases of alleged inaction.

The Court agrees with the Defendants that, under Delaware law, the _Aronson_ test is not appropriate where a plaintiff alleges claims arising out of a board's <u>inaction</u> in the face of perceived risks. In _In re Intel Corp. Derivative Litigation_, 621 F.Supp.2d 165, 172 (D.Del. 2009), the court stated that it "is unable to identify any Delaware authority holding that the _Aronson_ standard should be applied to allegations of conscious inaction." _Intel_ rejected a case that the Plaintiffs rely upon here, _In re Abbot Labs Derivative Shareholders Litigation,_ 325 F.3d 795, 806 (7th Cir. 2003). _Intel_ described _Abott Labs_ as falling within a minority view. _Intel_ noted that a Third Circuit opinion, _Fagin v. Gilmartin_, 432 F.3d 276, 282 (3d Cir. 2005), rejected _Abbot Labs_ as an incorrect application of Delaware law.[5] 621 F.Supp.2d at 173.

The Plaintiffs' position here - that the _Aronson_ test should be applied when a board has not taken any affirmative action -- is premised upon on _Abbott Labs_ and a Seventh Circuit opinion, _Westmoreland County Employees Retirement System v. Parker_, 727 F.3d 719, 725-26 (7th Cir. 2013), that follows _Abbott Labs_. Having carefully considered these and other cases,

---

[5]      _Abbott Labs_ purported to apply Illinois law, which it equated with Delaware law for purposes of demand futility analysis. 325 F.3d at 803.

this Court agrees with the reasoning in *Intel* and *Fagin*, and concludes that under Delaware law, the *Rales* test is the proper one to apply when the claim is that a director or officer's inaction was a breach of fiduciary duty to the corporation.  *See Zomolosky v. Kullman*, 70 F.Supp.3d 595, 604 & n. 11 (D.Del. 2014); *In re INFOUSA, Inc. Shareholder Litigation*, 953 A.2d 963, 985 (Del. Ch. 2007) ("Where the complaint does not address an action taken by the board, however, or alleges that the board failed to act, the inquiry narrows. The Court cannot address the business judgment of an action not taken and, therefore, should concern itself with what is now known as the *Rales* test").  Accordingly, the Court will apply the *Rales* test in this action.

> 2. The *Rales* test

Under *Rales*, a pre-suit demand on the Board was required unless the Complaint states particularized facts that show, "a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."  *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 58 (Del. Ch. 2015).  The Plaintiffs must plead facts specific to each director, demonstrating that at least half of them could not have acted in a disinterested fashion in response to a demand.[6]  *Id.*  The Court conducts this examination on a claim-by-claim basis.  *Id.* at n. 71.

Under Delaware law, Directors are presumed to be independent.  *Id.* at 59.  If the Complaint shows  that a given director faces a "substantial likelihood"[7] of personal liability, then

---

[6]     For the reasons set forth herein, the Court need not engage in a Director-by-Director analysis, as the Plaintiffs have not alleged facts sufficient to demonstrate a lack of independence as to <u>any</u> of WU's Directors.

[7]     The "substantial likelihood" standard is not specifically defined.  It is logical to assume that, whatever this standard requires in terms of pleading, it requires <u>at least</u> as much as Fed. R.

that director's independence is presumptively compromised.  *Id.*  However, the mere fact that a claim is asserted against a  director is not sufficient.; rather, the Complaint must contain particularized factual allegations that show that a given director engaged in conduct that is fraudulent, illegal, or in bad faith,[8] and further, that the director acted with actual or constructive knowledge that his/her conduct was legally improper.  *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008).

The Plaintiffs' claims in this action t are known as *Caremark* claims, based on *In re Caremark Intl. Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996).  *Caremark* recognizes that a director may be liable to a corporation for "an unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented [a] loss."  *Id.* at 967.  Such claims require a showing of bad faith, that is, that "the fiduciary intentionally fail[ed] to act in the face of a known duty to act, demonstrating a conscious disregard for his/her duties."  *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 369 (Del. 2006).  Thus, in the circumstances here, the  Complaint must state facts showing that: (i) the Defendants utterly failed to implement any anti-money laundering compliance system; or (ii) having implemented such a system, the Defendants consciously failed to monitor or oversee its operations, thus disabling themselves from being informed of risks or problems requiring their attention; and, in

---

Civ. P. 12(b)(6) would.  Because, as discussed herein, the Plaintiffs' claims do not even meet the Rule 12(b)(6) standard, they certainly cannot meet the "substantial likelihood" test.

[8]    Delaware law allows corporations to anticipatorily exculpate their directors from liability for ordinary breaches of fiduciary duty, leaving only liability for bad faith breaches of fiduciary duty or for intentionally engaging in illegal conduct.  8 Del. C § 102(b)(7).  WU has stated that it has done so, and the Plaintiffs do not disagree.

either case, (iii) that the Defendants knew that they were not discharging their fiduciary

obligations.[9]  *Id.* at 370.

A central feature of *Caremark*-type claims is the concept of "red flags."  A plaintiff is

required to plead, with particularly, certain circumstances or events that "put the directors on

notice of problems with their systems, but which were consciously disregarded."  *In re General*

*Motors Co. Derivative Litig.*, 2015 WL 3958724 (Del. Ch. Jun. 26, 2015) (slip op.).  Such "red

flags" are, essentially, a proxy for pleading knowledge.  *Id.*  The Plaintiffs are required to show

"obvious and problematic occurrences that support an inference that [WU's] directors knew that

there were material weaknesses in [WU's internal policies] and failed to correct such

weaknesses."  *Rich ex rel. Fuqi Intern., Inc. v. Yu Kwai Chong*, 66 A.3d 963, 983 (Del. Ch.

2013).

3.  Applying *Rales*

With these principles in mind, the Court undertakes a fairly detailed dissection of the

Complaint, examining whether the it contains sufficient factual allegations to demonstrate that

more than 50%  of WU's board members lacked independence with regard to consideration of a

demand that the  Board bring suit on these claims.

February 11, 2010 is the most pertinent date for beginning this analysis.   This date is the

start of the "Relevant Period" selected by the Plaintiffs in this action; the earliest date on which a

claim could accrue.  *Docket* # 38 at 1.  In addition, it is the date on which WU entered into the

Southwest Border Agreement with the State of Arizona.  These two facts combine to render the

events that  precede February 11, 2010 – and the Complaint references a fair number – irrelevant.

---

[9]      *Stone* cautions against "equat[ing] a bad outcome with bad faith."  *Id.* at 373.  It points
out that a "director's good faith exercise of oversight responsibility may not invariably prevent
employees from violating criminal laws, or from causing the corporation to incur significant
financial liability, or both."  *Id.*

The Plaintiffs repeatedly argue that WU was on notice of defects in its money-laundering compliance policies based on events, mostly regulatory enforcement actions, dating back as far as 2002.  These events clearly fall outside the Plaintiffs' self-identified "Relevant Period," and thus, do not alone give rise to any claim.

The Court understands the Plaintiffs to present these events as some sort of "background" evidence, suggesting that they reflect a series of "red flags" that should already have put WU's board on some sort of heightened notice by 2010.  But  this historical background is largely superfluous in light of the Southwest Border Agreement itself.  The SBA (and the allegations it resolves) is the only "red flag" that the Court need consider here, as it alone  demonstrates that WU's Board knew of alleged defects in WU's money-laundering compliance activities and the need for remedial action.  Accordingly, the Court disregards the allegations of events before February 11, 2010.

(a)  September 2010

The first post-February 11, 2010 event alleged in the Complaint occurred on an unspecified date in September 2010.  At that time, WU's management "informed the Board  . . . of *known or anticipated issues*" with proposals that the Monitor had made.  *Docket* # 38, ¶ 91 (emphasis in original).  The Complaint quotes  from an unidentified document in which WU's management reports that: (i) the Monitor was "suggesting greater control around [Front Line Associates] system sign-on" and background checks for these associates, although management noted that the SBA "only contemplates the use of E-verify," rather than a more complex background check; (ii) the Monitor was "considering data validation methods to rid system of false and faulty information"; (iii) that a policy or document known as the Southwest Border Risk Assessment "may need adjustment," after Arizona "submitted additional information

focusing on underlying criminal activity along [the Southwest border]," information which the Monitor may wish to "integrate[] into future risk assessments"; and (iv) the "Monitor approaches all issues with a law enforcement zero tolerance attitude," and "has a high expectation for [front-line associate] knowledge, awareness, and engagement." *Id.* The Plaintiffs assert that "there is no indication whatsoever that the Board rebuked management for objecting to" the Monitor's positions on the enumerated issues.

The Court finds that these allegations are insufficient, by themselves or in conjunction with others discussed herein, to demonstrate lack of independence by any Director  Reduced to their component parts, the issues enumerated above reflect a single disagreement between WU's management and the Monitor (as to whether the SBA required WU to screen its Front Line Associates via the E-verify system or whether the Monitor could demand more extensive background checks), one general criticism about the Monitor's attitude (that it was too exacting), and two issues for which management was merely providing the Board with information about what the Monitor might do in the future.  The Plaintiffs contend that the September 2010 report was itself a "red flag" that alerted the Board to some material deficiency in WU's compliance-related efforts.  This Court cannot say that a mere disagreement between WU and the Monitor over the type of background check the SBA required for Front Line Associates is the sort of red flag with which *Caremark* is concerned.[10]  Nor is the mere fact that WU believed the Monitor to

---

[10]    Even assuming that the issue of Front Line Associate background checks was a critical component of anti-money laundering compliance, the Plaintiffs improperly rely entirely upon the Monitor's demands as a proxy for allegations that WU's compliance systems were indeed defective.   As set forth above, the Plaintiffs' theory of conscious inaction by the Defendants requires two key showings: (i) that WU's policies were inadequate to deal with a serious issue, and (ii) that the Defendants knew of those inadequacies and failed to act.  The mere fact that the Monitor sought stronger background checks for Front Line Associates than WU was willing to perform is not sufficient to meet the Plaintiffs' burden of alleging that WU's use of the E-verify system to screen Associates was a serious inadequacy in WU's compliance efforts.  It may be

be taking an unduly-strict position sufficient to establish any genuine defect in WU's compliance policies.  Thus, this allegation fails to adequately allege any culpable conscious inaction by any Defendant that would give rise to an inference of lack of independence.

Even if the Complaint sufficiently demonstrated a problem with WU's compliance policies, other allegations  suggest that WU undertook remedial efforts to address it.  The Complaint states that in May 2011, management reported to the Board that  WU and the Monitor attempted to negotiate an agreement on issues involving Front Line Associates, but were unsuccessful and that WU was therefore discussing "proposed solutions" directly with the State of Arizona.  Notably, it is conscious <u>inaction</u> that triggers director liability; <u>action</u> in response to a situation, even ill-advised or grossly-negligent action, does not.[11]  *See e.g. General Motors*, 2015 WL 3958724 at *17; *South v. Baker*, 62 A.3d 1, 18-19 (Del. Ch. 2012) (acknowledging the balance between the costs of regulatory compliance and the desire to maximize profits, and recognizing that "[d]irectors who try to 'get this balance right,' are protected by the business judgment rule, even if they fall short in the attempt").  The Complaint does not assert facts (or

---

that the Monitor was, simply, wrong: perhaps the Monitor was taking an unreasonably strict line, or perhaps the differences between the Monitor's demand and WU's existing policy are not significant enough to require Board action.  Thus, it is not sufficient for the Plaintiffs to merely allege that the Monitor took some position and WU opposed it.  The Plaintiffs are required to allege specific facts that would show that WU's position on such an issue was itself indefensible or otherwise demonstrate that the Monitor's demands indeed reflected a clear defect in WU's policies.

[11]     The Delaware Supreme Court has observed that fiduciary duty claims arising out of alleged inaction by directors in the face of "red flags" is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment," and that "the presumption of the business judgment rule, the protection of an exculpatory § 102(b)(7) provision, and the difficulty of proving a *Caremark* claim together function to place an extremely high burden on a plaintiff to state a claim for personal director liability for a failure to see the extent of a company's business risk."  *See generally In re Citigroup Inc. Shareholder Derivative Litig.*, 964 A.2d 106, 125 (Del. Ch. 2009).

even a conclusion) that WU's attempts to negotiate with the Monitor or the Attorney General were frivolous, in bad faith, or merely an attempt to stall implementation of new money laundering compliance policies.

The Complaint also makes a passing reference to "management inform[ing] the Board in September 2010 that Arizona law enforcement advised [WU] of a large Californian Agent being the subject of an investigation," and that "the Board undertook no initiative or action." *Docket #* *38, ¶ 93.* The Complaint does not otherwise elaborate on this assertion or the underlying event. The Court cannot say that this bare allegation of misconduct by an employee, untethered to any specific allegations of particular defects in WU's policies, suffices as a "red flag" compelling Board action. *See Stone*, 911 A.2d at 373.

(b) <u>July 2011</u>

The Complaint also makes a passing reference to a July 2011 event in which "management informed the Board . . . that an internal review of the 157 riskiest [WU] agents in the Southwest Border Area concluded that more than 84% of those agents on the U.S. side of the border had one or more findings," and that "the Board again did nothing." The Complaint does not elaborate, much less explain what these "findings" are or what they entail, and thus this allegation fails to satisfy the Plaintiffs' pleading burden. (In any event, the Court notes that this allegation references an "internal review," which the Court assumes refers to a review conducted by WU itself. This somewhat undercuts the Plaintiffs' general implication that WU remained almost entirely passive on Southwest border issues during the relevant time period.)

(c) <u>December 2011</u>

In December 2011, management advised the Board about WU's ongoing compliance management activities and discussed "significant current risks" (the Complaint does not provide

16

context for the use of this phrase).[12]  The Complaint identifies two particular "risks" discussed. First, management reported that "the Monitor will be conducting unannounced visits," which raised concerns inside WU about "potential agent challenge and unpredictable results."  WU's management stated that it would "mitigat[e these concerns] by developing an operational guide for Monitor and a communication plan with the agents."  Second, management stated that the Arizona Attorney General raised concerns that closer regulation of money transfer services would shift the risk of money laundering to "Pre-paid and traditional financial institutions," which could implicate a different segment of WU's business.  In response to this, Management "conduct[ed] an internal analysis on prepaid and prepar[ed] a presentation for the  . . . [M]onitor outlining the low product risk" posed by WU's prepaid card business.  *Docket* # 38, ¶ 94.  The Plaintiffs contend that WU's efforts "did not focus on the Company's noncompliance, but rather, on efforts by the Monitor and regulators to implement an effective compliance system."  *Id.* Instead, the Plaintiffs contend that WU should have "instructed management to change course and cooperate proactively and in good faith with regulators and the Court-appointed monitor to implement an effective compliance system."  *Id.*, ¶ 95.

Once again, the Court cannot say that these allegations demonstrate that any Defendant was consciously inactive in the face of a genuine "red flag."  Neither allegation points to a clear defect in WU's compliance policies.  One merely highlights concerns that WU's agents might not respond correctly to surprise inspections by the Monitor.  The allegations instead reflect nothing more than WU's concern about certain steps the Monitor (or the State of Arizona) might take, and was formulating a plan to address those concerns.

---

[12]    The Plaintiffs make the somewhat incongruous assertion that "the Board continued to view the Court-appointed Monitor . . . . as the true 'significant risk' to the Company," despite the Complaint giving no such context for the use of the phrase "significant risk" in that way.  *Id.*

Putting aside the patent ambiguity in the Complaint and elsewhere,[13] the Court cannot say that WU's concerns about surprise inspections are necessarily a "red flag" indicating a material deficiency in WU's compliance efforts.  In any event, the Complaint itself suggests that WU was taking some kind of action to address the situation, namely by, among other things, implementing "a communication plan with the agents."  As to the concern that Arizona might expand its regulatory efforts into WU's prepaid card business, the Court cannot say that such a concern sufficiently alleges any inherent defect in WU's compliance activities, much less one that the Board was required to act upon.  To the contrary, the Complaint itself indicates that WU felt that the evidence did not indicate that prepaid card posed a significant money laundering risk and the Plaintiffs do not allege facts that would show that WU's conclusion was reached in bad faith.  The fact that WU sought to convince Arizona not to over-regulate unnecessarily is not evidence of culpable conduct by WU or its Directors.

(d) <u>February 2012</u>

At some point in or about February 2012, a dispute arose between WU and the Monitor over the scope of the Monitor's authority.  Apparently, until that point, WU only gave the Monitor information about "person-to-person" money transfers within a business unit at WU known as "WUFSI."  The Monitor requested information about money transfers through WU where the sender or recipient was a business; transfers that seem to be handled by a unit other than WUFSI.  Apparently with the blessing of the Corporate Governance and Public Policy

---

[13]     WU's concerns that agents might produce "unpredictable results" in surprise interviews with the Monitor may be benign or nefarious. For example, WU may have concerns that agents could fail to competently explain their understanding of WU's policies to the Monitor. On the other hand, WU might be concerned that agents tapped for surprise inspections could disclose negligent or even criminal deficiencies in WU's compliance policies. Although the Court is required to draw inferences in the Plaintiffs' favor when construing pleadings, the Complaint offers no indicia to suggest how the quoted text should be understood, and thus, the Court's interpretation would be pure speculation.

Committee, WU resisted those requests, contending that they fell outside the terms of the SBA. In March 2012, the Monitor, with the State of Arizona's support, petitioned the court overseeing the SBA for a determination of whether the Monitor was entitled to records of business transfers. WU opposed the request. Although, the court ruled on the Monitor's motion in January 2013, the Plaintiffs acknowledge that, even now, they do not know the outcome of that ruling because it is sealed. *Docket # 38, ¶ 105-108.*

Once again, the Complaint does little more than assume that WU's resistance to a request made by the Monitor is a "red flag" demonstrating WU's inadequate compliance efforts and, thus, the Board should have immediately capitulated to the Monitor's demands. The Court will not repeat what has been said above, except to observe that the Plaintiffs' burden is to allege specific facts that show that WU's compliance efforts were materially deficient. The mere fact that a third party asserted as much is not, of itself, sufficient to carry that burden. Something more is necessary: an independent factual demonstration that the Monitor's position was correct and WU's compliance systems were inadequate; a showing of conscious bad faith or dilatory purpose by WU in resisting the Monitor's demands, etc. None are present here.

(e) <u>March 2012</u>

In March 2012, a U.S. Attorney's Office in California advised WU that it was a target in a money laundering investigation involving an individual named Wang, who was serving as the manager of a WU agent called US Shen Zhou ("Zhou"). Zhou processed more individual transactions and dollar volume (indeed, by several multiples) than any other WU agent. Mr. Wang ultimately cooperated with the FBI, admitting to engaging in illegally structuring transfers to avoid reporting requirements. Mr. Wang stated that he "acted, at least in part with the intent

to benefit [WU]."[14]  More importantly, the Plaintiffs allege that, according to the FBI, in our about May 2010, a whistleblower at Zhou "informed [WU's] Corporate Compliance Department that she . . . handled large amounts of cash with instructions to falsify the transactor's identification."  *Docket # 38, ¶ 97-103.*

The Complaint presents these assertions without additional comment, making it unclear what, if anything, WU did in response.  Moreover, the allegations do not allege when (or if) the Compliance Department ever reported the whistleblower's allegation to the Board of Directors. The absence of any allegation that the Board was advised of the situation involving Mr. Wang, Zhou, or the whistleblower makes this event immaterial for purposes of demonstrating conscious inaction by any Defendant.

(f)  <u>Late 2012</u>

At some unspecified point in time, the Monitor issued recommendations for changes in WU's anti-money laundering compliance policies.  (The Complaint does not disclose many particulars about the recommendations themselves.)  By late 2012, WU determined that it would be unable to implement the recommendations by the July 2013 deadline.  The Complaint refers to certain internal WU memos from December 2012 indicating that WU had completion rates between 0% and 10%  in certain categories  and was acknowledging that "major components" of the recommendations were "at risk for a July 2013 delivery date."  In May 2013, management informed the Board that "major issues" relating to the recommendations "still remained open" and that a consultant advising WU would be reporting to the Monitor that "key areas" in the

---

[14]  The Plaintiffs place some particular emphasis on Mr. Wang's statement that he intended to benefit WU.  Nothing in the Complaint provides any basis to believe that any representative of WU's management or officers conspired with Mr. Wang or Zhou, or was in any way aware of his criminal activities.

company's compliance policies "should be improved."  The Plaintiffs allege that, "[n]othing indicates that, upon learning this news, the Board expressed impatience or disappointment."

At some point in or about late 2013, the State of Arizona apparently declared that WU had not made adequate progress in implementing the Monitor's recommendations, such that Arizona was prepared to declare a "material breach" of the  SBA.  This threat returned the parties to the bargaining table, and on January 31, 2014, WU agreed to amend and extend the terms of the SBA.  Among the new terms were agreements that: (i) the Monitor would continue to oversee WU through at least June 2017; (ii) WU would provide the states of California, Arizona, New Mexico, and Texas with data on all transactions over $500 to or from locations within the Southwest border area until February 2019,; and (iii) WU would implement certain recommendations by the Monitor, in both its person-to-person money transfer unit and, presumably, its business-related money transfer unit.  The Plaintiffs assert that more timely efforts to comply with the SBA might have alleviated the need for an amended agreement, and have spared WU the costs of providing the transaction data through 2019 and continued oversight by the Monitor.  *Docket #* 38, ¶ 121-124.

Notably, the Plaintiffs do not allege that the Board declined to act in response to the December 2012 advisement about difficulties in implementing the recommendations; indeed, the Complaint is silent as to what happened in the aftermath of that meeting.  The Complaint simply alleges that six months later (in May 2013) the Board was advised that "major issues still [remained] open."  Once again, the Complaint does not expressly accuse the Board of ignoring this information[15] or failing to take some available curative action.  The Plaintiffs appear to rely

---

[15]     At best, the Plaintiffs note only that the news did not cause the Board to "express[ ] impatience or disappointment."

on an inference that because WU was behind in implementing the recommendations in December 2012 and was still behind in May 2013,  that the Board was consciously failing to act. Such a broad, vague, and speculative inference is not consistent with the Plaintiffs' obligations to plead particularized facts demonstrating a viable claim.

(g)  July 2013

In July 2013, a consultant retained by WU presented the Compliance Committee with a draft "risk assessment" for the Southwest border area.  WU's Chief Compliance Officer used that document to prepare a document entitled "Anti-Money Laundering Risk Assessment of the Southwest Border Area . . ." ("the Risk Assessment").  The Risk Assessment was intended to be a "constitutional document" setting forth the contours and principles of the anti-money laundering program that WU would implement to satisfy its obligations under the SBA and other regulations.  The Board approved the Risk Assessment on October 11, 2013.  The Complaint states that this Risk Assessment "did not, however, reflect a change in the Board's adversarial approach to compliance," because it "made clear that it was location-specific . . . and limited to the risks associated with money laundering and terrorist financing" only in the Southwest border region.  The Complaint alleges that "other geographical areas in the United States," such as South Florida, New York, and Chicago, are also "considered both high-intensity drug trafficking and high-intensity financial crimes areas," and that WU's Board did not prepare risk assessments for those areas.  Thus, according to the Complaint, the Defendants "allowed the misconduct[16] to

---

[16]     It is not clear what "misconduct" refers to in this context.  The Court assumes that the Complaint implies that criminals in Chicago, New York, and South Florida also use WU's money transfer service to launder proceeds of criminal activity, perhaps even implying that the magnitude of such use is consonant with that of the Southwest border area.  With the exception of the text quoted above, nothing in the Complaint actually asserts, or even clearly implies, as much.

continue unabated and proliferate in numerous, very high risk areas . . . knowing that this put the long term viability of the Company at risk." *Docket # 38,* ¶ 115-120.

This allegation is curious in several respects. The Complaint acknowledges that the Risk Assessment was specifically created pursuant to the Southwest Border Agreement; the Complaint does not allege that the SBA required WU to create risk assessments for jurisdictions outside the Southwest. Rather, the Complaint alleges that WU's obligation to complete risk assessments for other locations was triggered by "review of publicly available information from the [U.S. Drug Enforcement Administration and U.S. Treasury Department]" that revealed s other geographical areas in the United States as high-intensity crime areas. As is often the case, the use of the passive voice – "review of," or "reveals that" – obscures precisely who is acting. Is the Complaint alleging that WU's Board "review[ed the] publicly available information"? Or is the allegation that the Board <u>should</u> have done so (and if so, what event triggered that duty)? What is the nature of this "publicly available information" and what does it actually say? And, perhaps most significantly, what is the basis for the Plaintiffs' belief that a mere designation by these agencies of a certain location as being a "high-intensity financial crimes" area triggers WU's obligations to issue a comprehensive risk assessment that specifically addresses those geographic areas? All of these questions are left unanswered by the Complaint, and the lack of such answers prevents these allegations from sufficing to state a colorable claim against any Defendant. *See e.g. Wood*, 953 A.2d at 143 ("red flags are only useful when they are either waved in one's face or displayed so that they are visible to the careful observer").

(h) <u>March 2014</u>

In March 2014, WU was notified by a U.S. Attorney's Office in Florida that it was a target of a money laundering investigation focused on certain WU agents in Central America.

Beyond alleging that the U.S. Attorney issued subpoenas to WU for various records relating to this incident, the Complaint only states that this investigation is "ongoing." Plaintiffs seem to contend that the investigation is partly attributable to WU's failure to create a Florida Risk Assessment, although this is a conclusion for which the Complaint offers no particular supporting facts. *Docket* # 38, ¶ 125-129.

For many of the reasons discussed above, the Court finds this allegation sufficient to fulfill the Plaintiffs' pleading burden. The Complaint does not allege that the Board was advised of this investigation, nor what particular steps the Plaintiffs believe the Board should have taken, but did not, in response to the investigation.

As the foregoing makes clear, none of the Complaint's allegations, individually or in combination, show particularized facts sufficient to establish the existence of a "red flag," the Board's knowledge of that flag, and inaction by the Board in response to it. Accordingly, the Court finds that the Plaintiffs failed to allege facts sufficient to demonstrate that any Board member, including the named Defendants, faces a <u>significant</u> likelihood of personal responsibility for the conduct alleged in the Complaint. The Complaint does not contain sufficient allegations to rebut the presumption that Board members will act independently in assessing a demand that WU pursue the claims stated in this action. Therefore, the Plaintiffs' failure to make a pre-suit demand on the Board is not excused, and the failure to make a pre-suit demand requires dismissal of the Plaintiffs' claims.[17]

---

[17] Although demand futility is assessed on a claim-by-claim basis, *Teamsters*, 119 A.3d at 58 n. 71, there is no reason for the Court to proceed to assess whether demand was futile with regard to Claims 3-6. As noted above, those claims are largely premised upon the Plaintiffs successfully establishing the breaches of fiduciary duty alleged in Claims 1 and 2. Because demand is not excused as to Claims 1 and 2, it cannot possibly be excused as to the remaining claims.

4. <u>Leave to replead</u>

The Court pauses here to acknowledge that this outcome is a result of deficient <u>pleading.</u> It is possible that  that there are facts that have not been plead, but could be plead to cure the deficiency.  Accordingly, the Court dismisses the action, but stays the effect of such order  for a period of 30 days, during which the Plaintiffs may, if they can, file an amended Complaint that corrects the deficiency.

In doing so, the Court notes that the Plaintiffs must fundamentally reshape their concept of the case.  To indulge in an extended metaphor, it appears that t the Plaintiffs have a profoundly different understanding of the plot of this story than can be pursued here.  The Plaintiffs focus on the tragic fall of WU beginning in  2002.  But the story pertinent to the claims asserted starts on February 11, 2010 when WU entered into the SBA agreement.  In addition, the story is not about the <u>fall</u> of WU, but instead about WU attempts (if any) to <u>reform</u> itself from lax supervision and inappropriate conduct with the help of  a sponsor (the State of Arizona or the Monitor).  The  *Caremark*-type claims make the story-line about whether WU has been able to identify its faults and what efforts it has made to  overcome them.   When attempting to replead, the Plaintiffs should be mindful of the proper focus of the claims herein.  Such repleading can therefore dispense with irrelevant material (such as most allegations concerning matters outside the Relevant Period) and conclusory and argumentative material regarding WU's character as compared to specific statements identifying its actions and inaction.  In addition, the Plaintiffs

---

To the extent the Plaintiffs argue that some claims, such as Claim 3 alleging proxy fraud, could survive even in the absence of proof of other allegations, the Court finds that these claims are nevertheless deficient insofar as they are insufficiently conclusory or otherwise fail to state a cognizable claim.

should be specific about key factual information, such as dates, persons involved in actions, and specific statements made or actions performed (rather than characterizations of what occurred).

Accordingly, the Defendants' Motion to Dismiss is granted.

### C. Mr. Schierman's motion[18]

In addition to joining in the Defendants' Motion to Dismiss, which the Court has now granted, Mr. Scheirman seeks dismissal of the claims against him on Rule 12(b)(6) grounds. Because the Court dismisses the Complaint on other grounds, it need not reach the arguments in Mr. Schierman's motion.

Only because the Court is granting leave to amend does it comment generally on the allegations against Mr. Schierman. The Court agrees to some extent with Mr. Schierman that the Complaint improperly attempts to sweep Mr. Schierman up in generic references to "Individual Defendants" or "Officer Defendants" without specifically identifying and explaining those situations in which he or other officers or directors were involved. Mr. Schierman has unique status here, as the only non-Director Defendant, and that status requires more specific explanations of how Mr. Schierman's acts subject him to personal liability. (The Court also has doubts that any of the Complaint's citations to paragraphs 8, 40, and 76-80 support their contention that they adequately pled facts that would show that Mr. Schierman had actual responsibility for internal controls at WU.) In short, the Court strongly encourages the Plaintiffs

---

[18] Both parties' briefs on this motion cite to certain public securities filings via web links that are either presented in an impractical format and without meaningful direction to specific documents and pages (e.g. Mr. Scheirman's links to www.sec.gov) or are simply inaccessible without a required login (e.g. the Plaintiffs' links to a document hosted at cloudfront.net). Assuming, without finding, that these documents are properly tendered to the Court for consideration on a Rule 12(b)(6) motion, both parties are advised that it is highly preferable for them to submit such documents as exhibits within the Court's ECF system, rather than relying upon web links that may go stale, get redirected, or otherwise become inaccessible. Regardless of how the parties choose to present these exhibits, specific citations to the pertinent page numbers are mandatory.

to revisit the entirety of the Complaint with regard to Mr. Schierman and to sharpen, prune, and refine its allegations with regard to him and other individual Defendants.  Should Mr. Schierman believe that any amended Complaint still fails to adequately state a claim against him, he may re-assert the arguments in the instant motion, and the Court will examine those allegations mindful of the instructions this opinion.

## CONCLUSION

Accordingly, the Court **DENIES AS MOOT** Mr. Schierman's Motion to Dismiss **(# 56)**. The Court **GRANTS** the Defendants' Motion to Dismiss **(# 57, 58)** and **DISMISSES** the Plaintiffs' claims without prejudice.  The Court will **STAY** the effect of this Order for a period of 30 days, within which the Plaintiffs may file an Amended Complaint that cures the defects noted herein.

Dated this 31st day of March, 2016.

**BY THE COURT:**

Marcia S. Krieger
Chief United States District Judge