IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 14-cv-00144-MSK-KLM

**STANLEY LIEBLEIN, Derivatively on Behalf of The Western Union Company,
CITY OF CAMBRIDGE RETIREMENT SYSTEM, and
MARTA/ATU LOCAL 732 EMPLOYEES RETIREMENT PLAN,**

    Plaintiffs,

v.

**HIKMET ERSEK;
SCOTT T. SCHEIRMAN;
JACK M. GREENBERG;
DINYAR S. DEVITRE;
RICHARD A. GOODMAN;
BETSY D. HOLDEN;
LINDA FAYNE LEVINSON;
ROBERTO G. MENDOZA;
SOLOMON D. TRUJILLO, and
FRANCES M. FRAGOS TOWNSEND**

    Defendants,

-and-

**THE WESTERN UNION COMPANY, a Delaware corporation,**

    Nominal Defendant

_____

**OPINION AND ORDER GRANTING MOTION TO DISMISS**
_____

**THIS MATTER** comes before the Court pursuant to the Defendants' Motion to Dismiss the Plaintiffs' Verified Second Amended Consolidated Shareholder Derivative Complaint **(#137)**, the Plaintiffs' response **(#143)**, and the Defendants' reply **(#146)**.

1

## ALLEGED FACTS

This is a shareholder derivative suit brought by shareholders of Nominal Defendant Western Union Company ("WU") against certain WU directors and officers. The Verified Second Amended Consolidated Shareholder Derivative Complaint ("Second Amended Complaint") **(#132)** is lengthy and complex, so the Court offers only a greatly summarized version of facts here and elaborates in more detail in its analysis as necessary. All allegations are viewed in the light most favorable to the Plaintiffs.

WU's primary business operations involve facilitating domestic and international money transfers, by which a customer may send money to a recipient nearly anywhere in the world, usually within a matter of minutes. WU provides this service through a broad network of domestic and international "agents," individuals and entities that serve as WU's storefronts where customers can send or receive funds.

WU owns and operates two subsidiary organizations. Western Union Financial Services, Inc. ("WUFSI") facilitates consumer-to-consumer money transfers, and Western Union Business Solutions ("WUBS") facilitates business-to-business and business-to-consumer money transfers.

The money transfer industry is a common means by which persons engaged in serious criminal activity attempt to launder money. As a consequence, the money transfer industry is heavily-regulated, both domestically and internationally. Among other things, transactions above a certain dollar threshold trigger requirements that WU obtain and retain identification information for senders and recipients and require WU to disclose high-value transactions to regulatory authorities. Customers (both licit and illicit) sometimes attempt to avoid triggering these regulatory requirements by "structuring" a large transaction as several smaller transactions, each falling below the necessary dollar threshold.

WU allegedly has a reputation for lax compliance with these and other anti-money laundering ("AML") regulations. Customers were aware of this fact, and those seeking to avoid or evade scrutiny of their transfers were more likely to use WU than its competitors. This allowed WU to charge premium rates to such customers. As a result, WU has enjoyed an unusually large profit margin relative to its competitors and its market share.

After 2002, WU was the subject of frequent investigations and regulatory actions by state and federal authorities who sought to enforce WU's compliance with AML rules and policies. For purposes of this action, the most prominent of the regulatory actions was brought by the State of Arizona in 2005 against WUFSI. The Arizona investigation revealed that WUFSI and its agents were not maintaining proper records and that some of WUFSI's agents in the Southwest border area of the United States – Arizona and the area within 200 miles north and south of the United States/Mexico Border, which accounts for 25% of WU's domestic revenues – knowingly facilitated money laundering of funds paid over to human smugglers. In 2010, WUFSI and Arizona entered into a settlement agreement – the Southwest Border Agreement ("SBA") – intended to resolve the matter. Among its provisions, the SBA required WUFSI to allow a court-appointed Monitor to evaluate and recommend improvements to the company's AML procedures in the Southwest Border Area. Later, the SBA was expanded to include WUBS.

The Plaintiffs contend that, notwithstanding the SBA, WU has resisted adoption of the AML policies recommended by the Monitor, has attempted to narrow the scope of the Monitor's authority, and has generally resisted demands that it improve its (and its agents') compliance with regulatory requirements. In 2013, Arizona asserted that WU was in material breach of the SBA in various respects. The parties resolved that dispute by WU's agreement to extend the Monitor's oversight for several more years and to engage in even more aggressive recordkeeping

3

and reporting on transactions over $500 in the Southwest United States. The Plaintiffs contend that the additional expenses and reporting requirements resulting from this controversy could have been avoided if Defendants had ensured good faith compliance with governmental entities dating back as early as 2003.

Based on these allegations, the Plaintiffs filed a Complaint **(#1)** and asserted six causes of action. The Defendants moved to dismiss the Complaint **(#57, 58)**, arguing, among other things, that the Plaintiffs had not adequately pled facts showing that making a pre-suit demand on the WU Board of Directors to bring this action would have been futile. The Court granted the motion **(#97)**, but also gave the Plaintiffs leave to amend. The Plaintiffs subsequently filed their Amended Complaint **(#98)** and, later, a Second Amended Complaint **(#132)**.

In the Second Amended Complaint, the Plaintiffs allege, generally, that each named director and officer breached his/her fiduciary duties to WU by "consciously disregarding obvious and problematic deficiencies in WU's internal compliance policies and failing to correct such material weaknesses" after "they were each warned specifically and repeatedly, over a number of years, about … willful and widespread legal violations …" The Second Amended Complaint asserts two causes of action: (i) breach of fiduciary duty under an unspecified jurisdiction's common law against the "Individual Defendants", and (ii) breach of fiduciary duty under an unspecified jurisdiction's common law against Defendant Ersek.

The Defendants filed a joint Motion to Dismiss **(#137)**, again arguing that the Second Amended Complaint does not allege sufficient facts to warrant excusing the Plaintiffs from having to make a demand on WU's Board with regard to any of their claims.

## ANALYSIS

**A. Standard of review**

The Defendants bring their motion to dismiss under Federal Rule of Civil Procedure 23.1. Rule 23.1 requires plaintiffs bringing a derivative action to either make a pre-suit demand on the corporation's board or to plead with specificity why that failure should be excused. *In re ZAGG Inc.*, 826 F.3d 1222, 1227-28 (10th Cir. 2016). If the plaintiffs' pleadings are insufficient, their claims may be dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. *See McCall v. Scott*, 239 F.3d 808, 815-16 (6th Cir. 2001).

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all well-pleaded allegations in the Complaint as true and view those allegations in the light most favorable to the nonmoving party. *Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1149 (10th Cir. 2001) (quoting *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999)). The Court must limit its consideration to the four corners of the Complaint, any documents attached thereto, and any external documents that are referenced in the Complaint and whose accuracy is not in dispute. *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002); *Dean Witter Reynolds, Inc. v. Howsam*, 261 F.3d 956, 961 (10th Cir. 2001).

A claim is subject to dismissal if it fails to state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To make such an assessment, the Court first discards those averments in the Complaint that are merely legal conclusions or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678-79. The Court takes the remaining, well-pleaded factual contentions, treats them as true, and ascertains whether those facts (coupled, of course, with the law establishing the requisite elements of the claim) support a claim that is "plausible" or whether the claim being asserted is merely "conceivable" or "possible" under the facts alleged. *Id.* What is required to reach the

5

level of "plausibility" varies from context to context, but generally, allegations that are "so general that they encompass a wide swath of conduct, much of it innocent," will not be sufficient. *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012).

Further, Rule 23.1 imposes heightened pleading requirements as to why the failure to make a pre-suit demand on the corporation's board of directors should be excused. The pleading standard for Rule 23.1 is the same as for pleading fraud under Federal Rule of Civil Procedure 9(b). *Compare* Fed. R. Civ. P. 9(b)(requiring a plaintiff alleging fraud to "state with particularity" the factual basis for those claims) & Fed. R. Civ. P. 23.1(requiring a plaintiff in a derivative action to "state with particularity" why a pre-suit demand was not made). Pleading fraud imposes the heightened burden of pleading "the who, what, when, where, and how of the alleged fraud." *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 726-27 (10th Cir. 2006). Thus, at minimum, pleading the grounds for excusing pre-suit demand requires a complaint to set forth the who, what, when, where, and how of the reasons for failing to make the demand.

**B. Demand on Board of Directors**

This action is a derivative one; that is, the Plaintiffs are attempting to bring causes of action that properly belong to WU itself, as it is the entity that was ostensibly injured by the alleged wrongdoing of its directors and officers. The decision to commence litigation and assert causes of action belongs in the first instance to the corporation itself. As a result, most jurisdictions, including Delaware,[1] require that putative shareholder plaintiffs make a pre-suit demand upon the corporation's board that the corporation pursue the litigation. *See Kamen v. Kemper Financial Servs., Inc.*, 500 U.S. 90, 101 (1991); *see also* Fed. R. Civ. P. 23.1(b)(3).

---

[1] The issue of pre-suit demand on the board is governed by the law of the state of the company's incorporation, here, Delaware. *See Kamen*, 500 U.S. at 108-09.

Because such a demand may be futile, as it is often the directors themselves who would be defendants in the putative suit, some jurisdictions excuse the pre-suit demand in appropriate circumstances. It is undisputed that the Plaintiffs did not make a pre-suit demand on the Board. Thus, the question becomes whether the Second Amended Complaint alleges sufficient facts to carry the Plaintiffs' burden of showing that such demand would have been futile. *Beam v. Stewart*, 845 A.2d 1040, 1048-49 (Del. 2004).

To demonstrate futility, and thus avoid the need for a pre-suit demand on the Board, the Plaintiffs must allege particularized facts that show, "a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 58 (Del. Ch. 2015). The Plaintiffs must plead facts specific to each director, demonstrating that at least half of them could not have acted in a disinterested fashion in response to a demand.[2]

Two tests govern the issue of demand futility under Delaware law, depending on the nature of the allegations. If the suit challenges a particular decision made by the board, the Court applies the *Aronson* test. *See Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984). The *Aronson* test requires the plaintiff to plead facts sufficient to demonstrate a reasonable doubt as to whether: (i) the directors were disinterested or independent with regard to the decision in question; or (ii) that the challenged decision was the product of a valid exercise of business judgment. If the suit does not challenge a specific business decision, but rather, challenges the board's failure to adequately carry out its oversight duties, the Court applies the *Rales* test. *See Rales v. Blasband*, 634 A.2d

---

[2] For the reasons set forth herein, the Court need not engage in a Director-by-Director analysis, as the Plaintiffs have alleged generally that each Director was on notice of the need to act and each failed to do so.

927, 934 (Del. 1993). The *Rales* test is essentially the first prong of the *Aronson* test—the Second Amended Complaint must plead particularized facts demonstrating that the board could not have made a disinterested and independent decision regarding the demand. Despite the nominal characterization of *Aronson* and *Rales* as offering distinct analytical frameworks, at least one court has observed that that they effectively examine the very same questions. *See Kohls v. Duthie*, 791 A.2d 772, 780-81 (Del. Ch. 2000). The parties here agree that the salient inquiry as to whether the Plaintiffs' demand would have been futile is whether the defendant directors could have made a disinterested or independent decision regarding a demand. Based on that agreement, the Court will apply the *Rales* test.

Under Delaware law, directors are presumed to be independent. *Teamsters Union*, 119 A.3d at 59. If the Second Amended Complaint shows that a given director faces a substantial likelihood of personal liability, then that director's independence is presumptively compromised. However, the mere fact that a claim is asserted against a director is not sufficient to demonstrate potential liability; rather, the Second Amended Complaint must contain particularized factual allegations that show that a given director engaged in conduct that is fraudulent, illegal, or in bad faith, and further, that the director acted with actual or constructive knowledge that his/her conduct was legally improper. *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008).

There are several categories of conduct that expose directors to personal liability: (1) intentional action with a purpose other than to advance the corporation's best interests; (2) action with the intent to violate applicable positive law; (3) failure to act in the face of a known duty to act,[3] demonstrating a conscious disregard of duty; and (4)(a) the utter failure to implement any

---

[3]*Stone* cautions against "equat[ing] a bad outcome with bad faith." *Stone*, 911 A.2d at 373. It points out that a "director's good faith exercise of oversight responsibility may not

8

reporting or information system or controls despite knowledge of a duty to do so, or (b) having implemented such a system or controls, the conscious failure to monitor or oversee its operations despite knowledge of a duty to do so. *Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006). Claims asserting that directors engaged in any of these categories of conduct are colloquially known as *Caremark* claims, based on *In re Caremark Intl. Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996).

The Plaintiffs argue that the Second Amended Complaint makes a showing that at least half of the Board faces a substantial likelihood of personally liability under the first three types of *Caremark* claims. However, their arguments as to each category are the same. They assert that the Board was confronted with deficiencies in WU's management's conduct as to AML compliance and implementation of the Monitor's recommendations, but either condoned the deficiencies or remained consciously passive. There is no allegation that the Board instructed WU's management to act as they did or even knew in advance that the managers would do so. Thus, the Court will limit its analysis to the third category of *Caremark* claims—whether the Second Amended Complaint sufficiently alleges that the Board intentionally failed to act in the face of a known duty to act, demonstrating a conscious disregard for its duties.

A central feature of the third category of *Caremark* claims is the concept of "red flags." A plaintiff is required to plead, with particularly, certain circumstances or events that "put the directors on notice of problems … which were consciously disregarded." *In re General Motors Co. Derivative Litig.*, 2015 WL 3958724 (Del. Ch. Jun. 26, 2015) (slip op.). Such "red flags" are, essentially, a proxy for pleading knowledge. The Plaintiffs are required to show "obvious and problematic occurrences" that support an inference that WU's directors knew that there were

---

invariably prevent employees from violating criminal laws, or from causing the corporation to incur significant financial liability, or both." *Id*. at 369.

material weaknesses in WU's internal policies and consciously failed to correct such weaknesses. *Rich ex rel. Fuqi Intern., Inc. v. Yu Kwai Chong*, 66 A.3d 963, 983 (Del. Ch. 2013).

Thus, the Court first determines whether the allegations in the Second Amended Complaint are sufficient to raise red flags that would put the Board on notice that it must take action. The Court then determines whether the allegations are sufficient to show that the Board consciously failed to address the red flags.

1. **Red flags**

As the Court previously ruled in its Opinion and Order Granting Motion to Dismiss **(#97)**, February 11, 2010 is the most pertinent date for beginning this analysis. This date is the start of the "Relevant Period" identified by the Plaintiffs in their original Complaint, and the earliest date on which a claim could accrue.[4] *Docket* # 38 at 1. In addition, it is the date on which WU entered into the SBA with the State of Arizona. These two facts combine to render the events that precede February 11, 2010 – and the Second Amended Complaint references a fair number – irrelevant. The Plaintiffs repeatedly argue that WU was on notice of defects in its money-laundering compliance policies based on events, mostly regulatory enforcement actions, dating back as far as 2002. These events clearly fall outside the Plaintiffs' self-identified "Relevant Period," and thus, do not alone give rise to any claim.

The Court understands the Plaintiffs to present these events as some sort of "background" evidence, suggesting that they reflect a series of "red flags" that should already have put WU's board on some sort of heightened notice by 2010. But this historical background is largely

---

[4] The Second Amended Complaint does not identify any "Relevant Period", as was done in the Complaint, but there is no reason to believe that they can alleged actionable conduct occurring before that date.

10

superfluous in light of the SBA itself. Accordingly, the Court disregards the allegations of events before February 11, 2010.

Nevertheless, the SBA itself is certainly a "red flag" that informed the Board of alleged defects in WU's AML program in the Southwest Border Area and the need for remedial action. The SBA set the deadline of July 2013 to implement a legally compliant AML program. Additionally, over the course of three years, a significant portion of WU's Southwest Border agents failed AML compliance tests. In February 2010, 27% of those tested failed. In September 2011, checks revealed that 84% of WU's "high-risk agents" on the Southwest Border were not fully AML compliant. In July 2013, an investigation revealed that there were twenty-eight cases involving confirmed instances of human smuggling facilitated by money transfers through WU. Further, the Monitor made almost one hundred recommendations for WU to implement, and the Board was notified of each recommendation. Therefore, the Second Amended Complaint sufficiently alleges red flags putting the Board on notice of the need to implement a legally compliant AML program in the Southwest Border Area.

2. **The Board's action or inaction in response to red flags**

The Plaintiffs ask the Court to infer that the Board consciously allowed WU's management to undermine the implementation of a legally compliant AML program in the Southwest Border Area. The Second Amended Complaint does not allege specific actions that WU's management engaged in that actually undermined its implementation. Rather, it describes WU's opposition to the Monitor's efforts to obtain information about WUBS, WU's opposition to two civil investigative demands, WU's management's compensation, WU's failure to implement all of the Monitor's recommendations before the deadline to do so expired, and a deferred prosecution agreement between WU and the United States Department of Justice in

11

which WU admitted that some of its employees and agents willfully failed to abide by AML laws and aided and abetted fraudsters. They claim that these circumstances support an inference that WU's management actually undermined the implementation of a legally compliant AML program under the SBA and that the Board consciously failed to prevent them from doing so. The Court will address each circumstance in turn.

### a. Opposition to the Monitor's efforts to obtain information about WUBS

In 2012, the Monitor requested access to information about all money transfers made in the Southwest Border Area, including those made by WUBS. WU's management opposed the request because WUBS was not a party to the SBA. It also called the request unreasonable and impractical and complained that it would cause delays. The Monitor filed a motion with the court overseeing the SBA, and the court ultimately made WUBS subject to the SBA.

As this Court noted in its prior order dismissing the Plaintiffs' Complaint, it is not sufficient to merely allege that the Monitor took some position and WU opposed it. Rather, it must allege specific facts that would show that WU's position on such an issue was itself indefensible or otherwise demonstrate that the Monitor's demands indeed reflected a clear defect in WU's policies. WU had a good faith basis to oppose the Monitor's request. The SBA expressly stated that it was a settlement between WUFSI and the State of Arizona; WUBS was not a party to it. Further, the Second Amended Complaint does not allege that WU's resistance was motivated by a desire to maintain a lax AML compliance program as to WUBS's operations that could be exploited for criminal enterprises. It merely criticizes the Board for not instructing WU's management to acquiesce to all of the Monitor's demands. This is simply insufficient show WU's position was indefensible or a clear defect in WU's policies. Thus, this opposition does not support an inference that WU's management was attempting to undermine the implementation of a legally compliant AML program.

### b. Opposition to Federal Trade Commission Civil Investigative Demands

Also in 2012, the Federal Trade Commission ("FTC") issued two civil investigative demands seeking documents related to WU's possible facilitation of fraudulent money transfers. WU's management sought to quash the demands. The Second Amended Complaint does not describe the contents of the demands or state WU's management's reason for seeking to quash them. It asserts that WU should have "simply compl[ied]" with them.

Again, it is not sufficient to merely allege that WU opposed a request as to its AML compliance. Instead, the Second Amended Complaint must show why WU's position was indefensible or reflected a clear defect in WU's policies. There are good faith grounds to oppose a civil investigative demand. *See* 16 C.F.R. §§ 2.7 & 2.10. But the Second Amended Complaint's allegations do not show that WU's opposition to the civil investigative demands was not made in good faith. In fact, it describes several other instances when WU was served with multiple subpoenas from grand juries and United States Attorney offices in California and Florida, with three rounds of grand jury subpoenas in Florida alone. Each subpoena sought evidence about WU's AML deficiencies. But WU's management did not seek to quash those subpoenas. In light of WU's compliance with the subpoenas, it simply does not follow that WU's management was attempting to undermine implementation of a legally compliant AML program by seeking to quash the two FTC investigative demands. Therefore, the opposition to two civil investigative demands does not support an inference that WU's management was attempting to undermine the implementation of a legally compliant AML program.

### c. WU management's compensation packages

WU's management compensation packages include incentive payments based on WU's total revenue and operating profit. That is, the greater WU's profit, the more money its management is paid. The Second Amended Complaint alleges that implementation of a legally-

compliant AML program would have decreased WU's total revenue and operating profit. As profits decreased, so would WU's management's incentive payments. Thus, according to the Second Amended Complaint, WU's compensation packages incentivize WU's management to undermine the implementation of a legally compliant AML program in the Southwest Border Area, and the Board should have changed WU's management's compensation packages to incentivize AML compliance.

The mere allegation that the Defendants had a financial incentive to subvert WU's AML compliance efforts is not sufficient to meet the Plaintiffs' pleading requirements. It is merely an identification of a possible motive, not a factual allegation of actual conduct by one or more Defendants. The Plaintiffs do not, for example, allege that a particular Defendant ever articulated a compensation-based argument for neutering WU's AML compliance or even that a Defendant made statements that causally coupled the concepts of AML compliance and Director compensation. Thus, the Plaintiffs have merely articulate the suggestion that the Board's actions could be "consistent with" a theory that they consciously avoided strengthening WU's AML compliance because doing so would lead to a loss of compensation. But as *Iqbal* explains, pleading facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility." 556 U.S. at 678. It is not enough to articulate a theory that <u>could</u> be used to infer unlawful reasons for another's actions, particularly where that same conduct can just as easily be explained by lawful reasons as well. *Id.* Here, the allegation that enforcing AML compliance might have decreased Director compensation does not suffice to carry the Plaintiffs' pleading burdens under *Iqbal*.

**d. Failure to meet the deadline to implement the Monitor's recommendations**

Likewise, WU's failure to meet the deadline to implement the Monitor's recommendations does not show that the Board was consciously allowing WU's management to

14

undermine the implementation of a legally compliant AML program. Although WU did not meet the deadline, it succeeded in implementing a majority of the recommendations. The Second Amended Complaint is replete with allegations discussing the number of recommendations made by the Monitor at a particular point and time and the number of those recommendations that WU had either partially- or fully-completed at that time. The Court need not track those facts on an ongoing basis. It is sufficient to observe that, over the three years of the initial iteration of the SBA, WU's completion rate on the Monitor's recommendations waxed and waned, ultimately reaching approximately 65% completion by May 2013. Although progress was being made, it became apparent in 2013 that WU was not going to meet its July 2013 deadline to implement a legally compliant AML program. Rather than suffer the consequences of breaching the SBA, WU negotiated an amended SBA. The amended SBA extended WU's deadlines and imposed additional requirements on WU. The Board approved the amended SBA.

Notwithstanding WU's progress in implementing the Monitor's recommendations, the Plaintiffs ask the Court to infer that because the implementation was not complete by July 2013, the Board acted in bad faith by not taking action to compel WU's managers to meet the deadline. Such a broad, vague, and speculative inference is not consistent with the Plaintiffs' obligations to plead particularized facts demonstrating a viable claim. There is a wide swath of potential explanations, many of them innocent, as to why WU failed to complete implementation of the recommendations by the July 2013 deadline. It may be that the recommendations were too expansive in their scope or the July 2013 deadline too ambitious. It may be that WU's efforts were undertaken in good faith but suffered from innocent mismanagement or inefficiency. It may be that the Board's instructions were not effectively carried out by lower-level management

15

or employees, or that the recommendations met unexpected resistance from the agents themselves.

The Court need not exhaustively catalogue all of the possible ways in which the failure of WU to meet the Monitor's deadline could be explained innocently; it is sufficient to observe that the Plaintiffs, who carry the burden of pleading facts demonstrating a plausible basis to conclude that the Board's actions were unlawful, has not done so. The Second Amended Complaint simply does not contain any specific allegations as to how the delayed implementation of the Monitor's recommendations can be attributed to conscious inaction by the Board.

### e. Deferred prosecution agreement

On January 18, 2017, WU entered into a deferred prosecution agreement ("Agreement") with the United Stated Department of Justice Money Laundering and Asset Recovery Section of the United States Attorney Offices for the Eastern and Middle Districts of Pennsylvania, the Central District of California, and the Southern District of Florida. In the Agreement, WU admitted that some of its employees and agents engaged in criminal conduct, that it accepted responsibility for that conduct, that it stipulated to certain facts, and that it agreed to penalties and conditions in exchange for having charges against WU dismissed after three years. Attached to the Agreement is a detailed Statement of Facts. The Statement of Facts describes the conduct of multiple WU employees and agents in the United Kingdom, Spain, Mexico, Peru, Costa Rica, California, Florida, New York, and Pennsylvania between 2004 and 2012.

The Court need not summarize the extensive Statement of Facts. It is sufficient to note that most of the incidents recited therein occurred prior to WU's entry into the SBA, or involved regions outside of the Southwest Border Area (*e.g.* agents in New York, the United Kingdom, Spain, Peru, etc. and structured transfers directed towards China) Of the few events that could be said to be timely and relevant to the Plaintiffs' allegations concerning WU's compliance with

the SBA, nothing in those facts indicate that the Board had any knowledge of the agents or WU managers involved or the events at issue. It is not enough for the Plaintiffs to allege that WU's <u>agents</u> were evading AML controls, nor is it enough to allege that WU's own <u>managers</u> were failing to control those agents. Indeed, it would not even be enough to allege that the Board was <u>aware</u> that there some agents were evading controls – indeed, that was the crux of the SBA itself. The standard that the Plaintiffs must meet – and have not – is to show that when faced with the knowledge that agents were evading AML controls, the Board consciously disregarded that knowledge and failed to take meaningful action. The allegations concerning the 2017 Agreement do not rise to that level.

**3. The Plaintiffs' failure to make a pre-suit demand is not excused.**

Thus, the Court finds that the Second Amended Complaint does not sufficiently allege that the Board consciously failed to act in the Southwest Border Area. The Board certainly knew of WU's need to implement a legally compliant AML program under the SBA. However, the Second Amended Complaint's allegations do not support a plausible inference that the Board consciously disregarded that obligation or allowed WU's management to undermine its implementation. Therefore, the Second Amended Complaint fails to suggest doubt as to whether the Board's members could have properly exercised independent and disinterested business judgment in responding to a pre-suit demand, and the Plaintiffs failure to make a pre-suit demand on the Board is not excused.

## **CONCLUSION**

For the foregoing reasons, the Court **GRANTS** the Defendants' Motion to Dismiss Plaintiffs' Verified Second Amended Consolidated Shareholder Derivative Complaint (**# 132**). The Plaintiffs' claims are **DISMISSED**. Inasmuch as the Plaintiffs have already amended their

complaint twice, and the Court has twice dismissed that complaint, the Court does not reflexively grant the Plaintiffs any further leave to amend. The Clerk of Court shall close this case.

Dated this 29th day of September, 2017.

**BY THE COURT:**

*Marcia S. Krieger*

Marcia S. Krieger
Chief United States District Judge